ELIZABETH RACHEL SAMIA & others *vs.* CENTRAL OIL COMPANY OF WORCESTER & others.

Suffolk. February 3, 1959. — April 28, 1959.

Present: WILKINS, C.J., RONAN, SPALDING, WILLIAMS, & CUTTER, JJ.

*Corporation*, Stockholder, Issue of stock, Ownership of stock, Officers and agents. *Equity Jurisdiction*, Stockholder's suit, Trust, Laches. *Fiduciary*. *Trust*, Constructive trust. *Gift*. *Unjust Enrichment*. *Agency*, Accounting by agent. *Laches*. *Equity Pleading and Practice*, Parties; Amendment; Master: findings. *Limitations, Statute of*. *Evidence*, Presumptions and burden of proof.

Subsidiary findings by a master respecting the formation of a family corporation to carry on an oil business then conducted by a brother and a sister as partners, who agreed that "twenty per cent [of the stock of the corporation] . . . should be issued to" a second brother who did the legal work attending the organization of the corporation and died shortly after signing and filing its articles of organization and subscribing to shares of its stock "now to be issued," warranted a conclusion that the second brother became a stockholder in the corporation, by way of a gift from his brother and sister, at the time the articles of

organization were filed and "the certificate of incorporation . . . . was issued," even though the stock issued was paid for wholly by a transfer to the corporation of the partnership assets in which the second brother had no interest and no stock certificate was issued to him. [109–110]

Where a master's conclusions are not based solely upon his subsidiary findings and are not inconsistent therewith and the evidence is not reported, his conclusions must stand. [110]

Three sisters had standing to maintain a minority stockholders' suit in the Superior Court in behalf of a corporation against their three brothers who controlled it, where it appeared that the sisters had become entitled to a minority stock interest in the corporation through decedents' estates of which one of the brothers was administrator, that demand on him as such to bring the suit would have been futile, that ultimately he, in purported recognition of the sisters' interest, had caused stock of the corporation to be issued to them over the other brothers' objections, so that the sisters were stockholders on the corporation's records at the time they brought the suit, and that the corporation's answer included a counterclaim against the brothers. [111]

Prior to entry of a decree after rescript in a suit in equity in the Superior Court in which the plaintiffs' brother was a defendant personally but it appeared that issues affecting successive intestate estates of another brother and of their mother through which the plaintiffs derived the interests underlying their claims had been fully pleaded and fully tried, the defendant brother by an amendment should also be joined as a party defendant in his capacities as administrator of those estates. [111]

Neither laches nor the statute of limitations barred a suit in equity by three sisters against their three brothers and a family corporation controlled by the brothers based on the brothers' knowingly appropriating to themselves, some eighteen years before the commencement of the suit, all of certain shares in the corporation which had belonged to a fourth brother who had died intestate leaving as his sole heir their mother, who died intestate shortly after such appropriation leaving the six sisters and brothers as her heirs, where it appeared that there was a "closely knit family" relationship among the six, that one of the three brothers was administrator of both the intestates' estates and one of the sisters was surety on one of his bonds and another sister surety on his other bond, that the "facts with relation to" the fourth brother's shares and the sisters' rights were concealed from the sisters by the three brothers and did not become actually known to the sisters until some two years before the commencement of the suit, and that the administrator never expressly repudiated his obligation to the sisters. [112–113]

Neither laches nor the statute of limitations barred a business corporation from seeking relief in a minority stockholders' suit against stockholders and directors who were in control of it during a period of many years during which their acts gave rise to the corporation's claims, where material facts underlying the suit did not become known to the plaintiffs until about two years before it was commenced. [113]

Samia *v.* Central Oil Co. of Worcester.

A restriction that a stockholder in a corporation should not transfer his stock without first offering it to the corporation was for the benefit of the corporation, and, in a suit in equity by heirs of an intestate against her administrator and the corporation to obtain stock formerly owned by the intestate, in which the corporation asserted no defence based on the restriction, it was no defence to the administrator that the restriction might have been invoked by the directors of the corporation to prevent a transfer of the stock to the plaintiffs. [114]

Where it appeared in a suit in equity brought by three sisters that after the death intestate of one of their four brothers the other three brothers, who were the controlling stockholders and directors of a family corporation, wrongfully appropriated to themselves equally ten shares of stock of the decedent in the corporation which should have passed ultimately to the plaintiffs through his and their mother's estates, that subsequently additional stock was issued to the three brothers, in effect without payment therefor, which doubled their stock holdings, that still later the brothers subscribed to and paid for varying amounts of additional stock, and that shortly before the commencement of the suit three and one third shares were issued to each plaintiff purportedly by reason of their claims to the ten shares, a final decree should be entered requiring each of the three brothers to surrender for cancellation three and one third shares as reflecting his proportion of the ten shares issued to the sisters and also to transfer to a sister three and one third shares as representing the part of the doubling of the stock holdings which she should have received, and affording each sister an opportunity to buy additional shares in the corporation on the same basis as that on which the brothers had subscribed and paid for additional shares, together with the privilege for a reasonable time to sell the rights to purchase stock to present stockholders or to any person approved by the trial court. [115–118]

Findings by a master in a suit in equity that a corporation incurred "all of the financial burdens" connected with real estate which it used in its business and upon which it paid taxes and made improvements justified a conclusion that the defendants, in whose names title to the property had been taken, held it upon a constructive trust for the corporation and the final decree properly ordered them to account to it for a sum which they had received and distributed among themselves by increasing a mortgage on the property. [119]

Where the conclusions of a master are based solely on his subsidiary findings, it is open to the trial judge and to this court to draw different conclusions from the subsidiary findings. [122]

Persons who were the controlling but not the only stockholders in a corporation had no right, in disregard of the interests of the minority stockholders, to exploit a business opportunity, suitable to be exploited by the corporation, by means of forming a second corporation in which they took all the stock and which was initially established in business by use of the first corporation's resources. [122]

In a suit in equity by three sisters against their three brothers, who were the controlling stockholders and directors of a family corporation in

which the plaintiffs had a ten per cent minority interest and who had
improperly exploited a business opportunity, suitable for exploita-
tion by the corporation, by means of forming a second corporation in
which they took equally all the stock in disregard of the plaintiffs'
minority interests in the first corporation, the final decree in the cir-
cumstances should provide that each defendant sell to one of the
plaintiffs ten per cent of his shares in the second corporation for ten
per cent of the price he paid therefor, instead of providing that the de-
fendants held their stock in the second corporation upon a constructive
trust for the first corporation, where the imposition of such a construc-
tive trust would mean that one defendant, who owned nearly fifty per
cent of the stock of the first corporation and was the principal wrong-
doer and with the other defendants owed the second corporation large
sums, "would be unjustly enriched at the expense" of the other de-
fendants through his stock interest in the first corporation and would
unjustly acquire practical control of the second corporation.  [122–125]

In a minority stockholders' suit against officers and directors of a cor-
poration, where it appeared that the corporation had paid the de-
fendants large sums for expenses over a period of years, they had at
least the burden of going forward with an explanation of the nature
and propriety of the expenses and, in the absence of any evidence per-
taining thereto, they were properly charged in the final decree with
the sums paid them.  [125–128]

There was no merit in a contention made in a suit by minority stock-
holders of a corporation that ratification by the corporation, acting
through certain officers and directors who were in control of it, of pay-
ments made from its funds to such officers and directors themselves
barred it from recovering the amounts of the payments from them.
[128]

Findings by a master in a suit by minority stockholders of a corporation
that defendants, the directors and officers of the corporation, caused it
to pay to a private loan company "excessive rates of interest and
. . . minimum charges" because a "continued conflict" among those
defendants as to the control of another corporation, formed by them,
made usual bank financing impossible and the two corporations had to
enter into a "package deal" with the loan company justified a con-
clusion that those defendants were chargeable with the excessive in-
terest and minimum charges paid.  [128–129]

A suit by minority stockholders of a corporation to recover for alleged
wrongs of defendants as officers and directors of the corporation could
be commenced without any prior demand on the board of directors to
institute suit to redress the wrongs where it appeared that such de-
fendants were "in complete control" and dominated the board and
that any such demand "would have been . . . futile . . . and would
not have resulted in any effective action."  [129]


BILL IN EQUITY, filed in the Superior Court on February 5,
1954.

The suit was heard by *Brogna, J.,* on a master's report.

*Richard Wait, (Andrew C. Bailey* with him,) for the defendants George D. Kaneb and others.

*J. Newton Esdaile,* for the defendant Beton M. Kaneb.

*Charles B. Rugg, (Levin H. Campbell & Harry M. Lack* with him,) for the defendant Central Oil Company of Worcester.

*Samuel Abrams, (George S. Abrams & Ruth I. Abrams* with him,) for the plaintiffs.

CUTTER, J. This is a minority stockholders' suit filed by three sisters alleging themselves to be stockholders in Central Oil Company of Worcester (hereinafter called Central) seeking relief against their brothers, Beton, Kenneth, and George Kaneb,[1] and against Central and the defendant Union Oil Company of Boston (hereinafter called Union). Central's answer included a counter-claim seeking relief against the brothers and Union.

A master filed a report and, in accordance with Rule 90 of the Superior Court (1954), summaries of evidence with respect to certain objections. By interlocutory decree, (1) motions by George, Kenneth, and Union to recommit the report were denied; (2) their exceptions were overruled; (3) exceptions of the sisters and Central, as well as certain exceptions of Beton, were sustained; and (4) the report as modified was confirmed. A final decree was entered, which gave substantially all the relief sought by the sisters and Central. George, Kenneth, and Union appealed from the interlocutory decree and they and Beton appealed from the final decree. The facts are stated on the basis of the master's findings.

### THE INTERESTS IN CENTRAL.

1. The brothers and sisters, together with a deceased brother Albert, are the children of Mrs. Nerzeh Kaneb. In early 1934, Beton Kaneb and his sister Rachel Samia

---

[1] Certain circumstances here discussed were considered in other aspects in *Kaneb v. Kaneb,* 334 Mass. 525, which reveals, as does the present record, "a serious cleavage . . . between Beton . . . and George and Kenneth."

"formed a partnership . . . to carry on the oil . . . business" and each "contributed $2,600 in cash to the partnership and . . . received a fifty per cent . . . interest." In 1934, "family conferences were held, looking toward the organization of a corporation to carry on the . . . business." Agreement was reached about "ownership of stock."

Early in August, 1934, Beton, Albert (the brother now dead, a recent law school graduate who did the legal work), Rachel, and Kenneth executed articles of organization for Central. Its authorized stock of one hundred shares of no par common stock was described as "now to be issued" and to be paid for wholly in tangible personal property (the partnership's assets). Beton subscribed for forty shares. Albert, Rachel, and Kenneth subscribed for twenty shares each. It was provided that a stockholder wishing to transfer stock must offer it to the corporation at the price fixed by three arbitrators or, at the election of the directors, the price of the proposed transfer. The directors could waive this restriction in any instance.

On August 28, 1934, Albert and Beton filed the articles of organization with the State Secretary. Albert was fatally stricken the next day and died intestate on September 5, 1934. His mother, Nerzeh Kaneb, his next of kin, died intestate on February 13, 1937. Beton was appointed administrator of Albert's estate and of Nerzeh's estate. The inventory of each estate "did not list any shares of stock in Central."

The master found that "Albert did become a shareholder in Central to the extent of twenty . . . shares . . . at the time these four parties signed the articles of organization . . . and . . . the certificate of incorporation . . . was issued." Despite the fact that no bill of sale was in evidence and the absence of "direct testimony as to the date that . . . the partnership property passed to Central," the master found that "it is a fair inference and . . . it was intended by the partners Rachel and Beton and the defendant Central, that title to the assets . . . should pass to Central

when . . . legally organized." He further found that "title . . . did pass to Central on August 28, 1934." In a summary of supporting evidence (under Rule 90), the master stated that after August 28, 1934, "Central continued to carry on the business formerly conducted by the partnership, using the assets of the . . . partnership . . . ." Beton took charge, assisted by Kenneth and Rachel Samia's husband.

Late in 1934, Samia ceased working for Central. Beton and Kenneth "thereafter . . . determined to eliminate the interest which Rachel had in the business. They did this by . . . neglecting . . . to recognize her as a director . . . or as a stockholder." The brothers "simply appropriated" her shares after her husband left Central's employ and "considered the stock as being in the treasury from the time they 'took' it, although . . . [it] did not actually go into the treasury until" September 20, 1938, when Central in behalf of the brothers repaid Rachel's original investment of $2,600 (plus $221.96) in return for a release to Beton as "executor of the will of Nerzeh Kaneb" and a purported assignment to Central of all her interest in the shares. In 1945, "Rachel complained [that] she had not received enough money, and the . . . [brothers] gave her notes totaling $7,500." The master justifiably found that "this release referred solely to the twenty . . . shares . . . for which Rachel had originally subscribed and . . . at the time of signing . . . Rachel was unaware" of any "right to a proportionate part of Albert's stock and . . . had no intention of releasing any interest in that stock."

In 1936, Beton told his brother George that the latter was the owner of six and two thirds shares of Central. "At the same time, Beton and Kenneth were each considered . . . to have acquired an additional six and two thirds . . . shares. There is no vote or corporate record extant with respect to these twenty . . . shares." The master found the shares to have been "Albert's stock . . . which under the laws of intestate succession passed to Albert's mother Nerzeh on his death." In thus dividing Albert's stock the master stated that the brothers "acted in the belief that

since they . . . the male members of the family . . . were going to conduct . . . Central they should have Albert's stock." The master also found (a) that they concealed "from the plaintiffs . . . what had been done" by a "conspiracy of silence . . . [and] the plaintiffs had no knowledge of the facts . . . until . . . 1952, when they were informed by Beton as to the original 'taking' . . . and the subsequent concealment," and (b) that in "a closely knit family such as the Kanebs, the sisters had a right to rely on the complete good faith of their brothers," a "confidence and trust" which the brothers "abused . . . by concealing . . . the real facts" about Albert's stock.

On December 31, 1936, a dividend of $120 on each share the brothers then held was paid from funds borrowed by Central from a bank. The amount thus paid as a dividend was then repaid by each brother to Central to purchase a number of new shares equal to the shares then in his name, thus doubling each brother's holdings. The bank loan was then repaid. No such dividend was paid, or new stock issued, in respect of Rachel Samia's stock. In 1940, the twenty shares formerly owned by Rachel were sold to Beton at $200 per share and the brothers also subscribed to varying amounts of new stock at the same price. In 1947, the brothers made further subscriptions to Central stock.

In 1952, Beton, claiming to be "troubled by the wrong . . . he and his brothers had done to their sisters," but also, as the master found, to further his own interests against his brothers, informed his sisters of the 1936 distribution of Albert's shares among the brothers. On November 6, 1953, each sister was issued three and one third shares of Central stock pursuant to a vote of Central's directors, purportedly by reason of their claims as next of kin of Nerzeh Kaneb to the shares originally subscribed for by Albert. Kenneth and George did not join in this action and object to it. The present suit was commenced in February, 1954.

2. We first consider whether the master could properly find that Albert became a stockholder in Central prior to his death. If he did not, the sisters have no interest in Central.

The Kanebs' business activities "through the years . . have been characterized by the utmost informality." In forming Central their actions were ambiguous and their intentions vaguely expressed. In this laxly handled family situation, where no rights of creditors or outsiders are involved, the master might reasonably have felt that he could not judge what the parties intended and did by standards of corporate procedure properly applicable to more widely owned business corporations. This is a case where it might be appropriate to regard formal acts as done promptly which in equity ought to have been done, *Morris Gordon & Son, Inc.* v. *Totoni,* 324 Mass. 182, 185–186, and cases cited, and where, to do equity among the parties, undue emphasis cannot fairly be placed upon strict compliance with corporate formalities.

The subsidiary findings about the formation of Central already stated justify the master's conclusion that Albert acquired twenty Central shares upon the filing of the corporate papers paid for by the immediate transfer of the partnership assets.[1] Beton and Rachel, owners of the partnership assets, at the family conference had "agreed . . . that . . . twenty per cent [of the stock] . . . should be issued to . . . Albert," although he owned no part of the partnership assets to be transferred to Central. In context this must be viewed as a finding[2] that Beton and Rachel intended a gift to Albert of the consideration to be paid for his shares. The fact that he had done the legal work in connection with forming the corporation, of course, may have influenced this gift.

---

[1] Certain cases discussed in the briefs deal with different situations of fact. See *Hudson Real Estate Co.* v. *Tower,* 156 Mass. 82, 83–84 (subscription seasonably withdrawn); *Lennox* v. *Haskell,* 253 Mass. 334, 338–339 (no assumption by corporation of predecessor partnership's lease); *L. E. Fosgate Co.* v. *Boston Mkt. Terminal Co.* 275 Mass. 99, 106; *Ingram* v. *Eichel's Spa, Inc.* 313 Mass. 109, 114 (stock subscriber not intended to be beneficial owner); *Rizzuto* v. *Onset Cafe, Inc.* 330 Mass. 595, 598 (shares not paid for). If G. L. c. 156, § 16, as amended, is applicable at all, it was satisfied if the partnership assets were transferred immediately upon the filing of the incorporation papers.

[2] In view of this finding, there is no occasion for applying here the principle discussed in *Bohaker* v. *Koudelka,* 333 Mass. 139, 141–143, that, where no gift is intended, a trust is implied for a person who pays for property, title to which is taken in another's name.

A formal instrument transferring the partnership assets would have been, of course, desirable and usual. In the absence of any showing that such an instrument was contemplated, the master could infer that the corporation at once simply took possession of, and used, the partnership's assets, all tangible personal property, and that the filing of the articles of organization was intended to be the formal act which would substitute for the partnership arrangement, and would effect, (a) the corporate set-up; (b) the distribution of shares in Central, and the gifts of shares to Kenneth and Albert (or the transfer of assets in payment for all the subscriptions); and (c) the corporate ownership of the former partnership assets. No share certificates at all were issued until 1945. Nevertheless, the parties all seem to have regarded Kenneth's, Beton's, and Rachel's shares as issued in 1934 upon the formation of the corporation. The master could regard Albert's shares as then issued too. Issuing a stock certificate is, of course, not necessary to make a subscriber or other person a shareholder. *Atlantic Transp. Co. Inc.* v. *Alexander Shipping Co. Inc.* 261 Mass. 1, 11. See *Hawes* v. *Anglo-Saxon Petroleum Co.* 101 Mass. 385, 395; *Buckman* v. *Gordon,* 312 Mass. 6, 9–10.

The master's subsidiary findings were made upon conflicting oral testimony and documentary evidence. It may well be that, in this ambiguous family situation, other subsidiary findings would have been equally reasonable. We, however, cannot go behind the findings, for the evidence is not before us and we have not heard and seen the witnesses. The master's conclusions with respect to this question of the issue of Albert's shares (unlike his conclusions about Union mentioned later) do not appear to have been based solely upon his subsidiary findings. Since these conclusions were consistent with his subsidiary findings, they must stand.

3. George, Kenneth and Union contend that, even if Albert became a stockholder, this suit cannot be maintained. In 1953, Beton caused three and one third shares of Central stock to be issued to each of his sisters pursuant to an obligation to them admitted by him as administrator of

Nerzeh Kaneb's estate. Even if these shares were improperly charged in part to the share accounts of Kenneth and George, instead of to Beton's (since the liability initially was his), the sisters appeared on the corporate records as shareholders when they brought this suit. See *Bridgeport Window Hardware Co.* v. *Osborne,* 222 Mass. 517, 521. This fact, and the fact that Central by counterclaim has joined in seeking relief, provide sufficient basis for maintenance of the suit.[1] We think also that the sisters could maintain this suit, where demand upon Beton as administrator to bring it would have been useless, under G. L. c. 230, § 5 (as amended through St. 1934, c. 116). See *Maltzman* v. *Hertz,* 336 Mass. 704. See also G. L. c. 215, § 6 (as amended through St. 1954, c. 556, § 2; later amended by St. 1958, c. 223); *Locke* v. *Old Colony Trust Co.* 289 Mass. 245, 252–254; *Jones* v. *Jones,* 297 Mass. 198, 203–205.

Because there has been actual distribution to the sisters in 1953 (see *Palmer* v. *Whitney,* 166 Mass. 306, 308–309) of ten Central shares which they should have received from Nerzeh Kaneb's estate shortly after her death in 1937, they need not resort to the Probate Court to compel this much of the distribution to them. See Newhall, Settlement of Estates (4th ed.) § 246. Cf. *Stuck* v. *Schumm,* 290 Mass. 159, 167. Cf. also *O'Neil* v. *Cogswell,* 223 Mass. 364, 366 (where there was no effective transfer of a note by an administratrix). Upon the circumstances here shown, the sisters can enforce directly in a court of general equity jurisdiction claims relating to these shares or to acts of the brothers. Beton, however, should be joined as a party in his capacities as administrator of Albert's estate and of Nerzeh's estate, by amendment in the Superior Court, prior to a decree after rescript. See *Maltzman* v. *Hertz,* 336 Mass. 704, 706, 708. All issues affecting these estates appear to have been fully pleaded and fully tried in this proceeding where Beton and all others beneficially interested have been

[1] *Hurt* v. *Cotton States Fertilizer Co.* 145 F. 2d 293, 295–296 (5th Cir.), suggests that, even apart from the issue of shares to them in 1953, the sisters would have standing to maintain this minority stockholders' bill.

parties. Such an amendment need not cause further hearings, except as in framing the decree after rescript the Superior Court judge may deem further hearings desirable.

4. The plaintiffs are not barred either by laches or by the statute of limitations. The master found that there was a relation of trust between the brothers and their sisters, based upon the "closely knit family" relationship, and that the brothers concealed from their sisters their activities with respect to Albert's stock. The mere existence of a family relationship has been held insufficient ground for imposing a constructive trust. See *Ranicar* v. *Goodwin*, 326 Mass. 710, 713–714. Cf. *Stetson* v. *French*, 321 Mass. 195, 198–200. There is here, once the finding is made that Central shares were issued to Albert, much more in the way of special fiduciary or quasi fiduciary obligation than mere blood ties. Beton was administrator of Albert's estate and of Nerzeh's estate. Rachel was a surety on his bond in Albert's estate and Janet, another sister, a surety on his bond in Nerzeh's estate. As such, as well as in their capacities of next of kin of Nerzeh, they were entitled to proper performance of Beton's fiduciary duties. George and Kenneth, upon the master's findings, must have known that "it was Albert's stock which was divided among them" in 1936 since the master found that the brothers "acted in the belief that since they . . . were going to conduct the business . . . they should have Albert's stock." George and Kenneth thus participated in and benefited from Beton's breach of trust. The position of George and Kenneth with respect to Albert's shares in some degree may have been analogous to that of an executor de son tort. See Newhall, Settlement of Estates (4th ed.) § 12. All three brothers, in any event, were directors of Central, a small family corporation, not a large publicly owned organization, and as such were in a special position of family trust. See *O'Brien* v. *O'Brien*, 238 Mass. 403, 408, 410–411. Cf. *Goodwin* v. *Agassiz*, 283 Mass. 358, 361–363. In Central the sisters each had at all times at least an indirect beneficial interest.

The master found that the sisters had no actual knowl-

edge of "the facts with relation to Albert's stock" or their rights until 1952. Doubtless, they knew before 1952 some facts relevant to their claims, even if they did not understand their significance.[1] With respect to the brothers' "conspiracy of silence" it may be said that "mere failure to reveal may be fraudulent where there is a duty to reveal." *Stetson* v. *French,* 321 Mass. 195, 198–199. In Beton's case there was a clear fiduciary duty, in a breach of which the brothers participated. Beton never expressly repudiated his obligation to his sisters, and, indeed, in part at least carried it out in 1953. See *Allen* v. *Stewart,* 214 Mass. 109, 113. Cf. *Feeney* v. *Feeney,* 335 Mass. 534, 542–543. In such circumstances, neither the statute of limitations nor the defence of laches is of any avail to any of the individual defendants. See *Blake* v. *Traders' Natl. Bank,* 145 Mass. 13, 16–17; Restatement 2d: Trusts, § 327, comment k; Scott, Trusts (2d ed.) §§ 327–327.2. See also *Tingley* v. *North Middlesex Sav. Bank,* 266 Mass. 337.

Central similarly is not barred. Central was at all times prior to 1953 in the brothers' hands and they then conceived their interests to be adverse to the assertion of the claims. *Old Dominion Copper Mining & Smelting Co.* v. *Bigelow,* 203 Mass. 159, 201. *Central Ry. Signal Co.* v. *Longden,* 194 F. 2d 310, 320–321 (7th Cir.).

The participation of Beton (who, as administrator, held legal title to Albert's shares for a portion, at least, of the period relevant here) and his brothers in the wrongful distribution to themselves in 1936 of the shares which should have gone to their sisters, and in other wrongs, cannot bar the sisters. Beton and his brothers cannot be heard to assert their own misconduct as a defence against those who have been injured by it. See Scott, Trusts (2d ed.) § 327.2. Cf. Restatement 2d: Agency, § 112. The defendants get no assistance from *Hays* v. *Georgian, Inc.* 280 Mass. 10, 16–17,

---

[1] One of the master's summaries of evidence shows that two of the sisters, Minerva and Janet, were not at the family conference which preceded the organization of Central. The master could have found that they, at least, were not charged with knowledge of any facts that Rachel, who was present, may have learned there.

for the sisters are not here comparable to purchasers of
stock from the original subscribers. The sisters claim in-
directly through an original subscriber, the administrator
of whose estate has been found to have acted since 1936 in
violation of his fiduciary duty.

The possibility that, after Nerzeh's death in 1937, Beton
as administrator would have been refused permission by
Central's directors to transfer three and one third shares to
each sister also affords no defence here. The restriction on
transfers of shares is for the benefit of Central, which
asserts no defence based upon it. See *Blabon* v. *Hay*, 269
Mass. 401, 408–409. Also, in 1953 when Beton tardily
moved to carry out his obligation to transfer three and one
third shares to each sister, Central's directors waived the
restriction.

5. The master with respect to the sisters' interests in
Central concluded, "I rule that the plaintiffs are entitled to
. . . ten per cent . . . of the . . . stock of Central as of
the present . . . . They have . . . received . . . ten . . .
shares [which] do not fairly represent the equity in Central
to which the plaintiffs are entitled. . . . [E]quity and
fairness require that . . . the individual defendants . . .
be required to transfer . . . an equal number of shares as
among themselves to bring the holdings of the plaintiffs to
. . . ten per cent."

The final decree ordered each brother "to transfer from
his . . . holdings . . . ten per cent . . . so as to bring the
holdings of each" plaintiff to three and one third per cent
of the outstanding Central stock. Beton objects (a) that
this order discriminates against him, as compared with his
brothers, who each received three and one third per cent
of the stock wrongly in 1936, and (b) that the sisters are not
entitled to more than the three and one third shares each
received in 1953. George and Kenneth object also on the
ground that, apart from the shares properly received by them
from Nerzeh's estate in 1936 and the shares paid for by the
borrowed dividend money on December 31, 1936, all their
shares were (or will be as the result of the present case) fully

paid for by or in behalf of them, respectively, and that, accordingly, there is no reason for their sharing with their sisters such stock issued for consideration.

The sisters should have had, with respect to the three and one third shares wrongly held by one of their brothers on December 31, 1936, the benefit of the same dividend and stock purchase opportunity which their brothers had on that date. The stock which each sister should have received upon Nerzeh's death also should not have been diluted thereafter by stock issues unfairly discriminating in favor of the brothers. Here, where the brothers acted for their own benefit with complete disregard of their sisters, we need not decide under what circumstances directors may be justified in issuing stock under G. L. c. 156, § 41, as amended by St. 1932, c. 136, on a basis which dilutes the interest of existing shareholders, without affording to existing shareholders preëmptive rights to subscribe. The master and the trial judge reasonably took the view that the sisters, under these circumstances, should equitably now have the same percentage of Central's stock as they would have had after Nerzeh's death and a proper distribution of Albert's shares; viz. ten per cent in the aggregate or three and one third per cent apiece. It is unlikely that the brothers, even acting with scrupulous fairness to their sisters at the time of each issue of new stock, would have permitted their sisters to subscribe for any larger percentage of Central's stock. That the brothers subscribed for different percentages, as among themselves, was a matter to which they all consented. It is no concern of the sisters.

There is, however, no occasion in one respect for treating the sisters more favorably than the brothers treated themselves. The brothers paid for their new stock (or will be required by the decree to do so), except that issued as a gift to Kenneth and Albert in 1934 and that issued by use of the dividend of December 31, 1936. All that the sisters are entitled to, at the most, is the right to buy new shares, on the same terms and in the same amounts, in relation to the shares which they should have held when the brothers made

subscriptions to new shares. The brothers cannot be heard to complain if their sisters are now treated as favorably as the brothers treated themselves.

6. The final decree ordered all outstanding Central shares to be cancelled and new shares issued in the proportions ruled by the trial judge to be equitable. In view of the disparity among the brothers' holdings of Central stock and of the different prices paid by them, respectively, at different times for differing amounts of Central stock, it seems to us more practical to afford substantially the same relief to the sisters by a slightly different method from that adopted in the final decree. Accordingly, the final decree is to be revised so that it will leave each brother holding the Central shares which he now holds, except for two minor adjustments: Each brother (1) must now surrender for cancellation a certificate for three and one third shares from his present holdings to reflect his fair part of the transfer in 1953 by Beton to the sisters of the ten shares improperly distributed by Beton in 1936 to the brothers,[1] and also (2) must now transfer to one of his sisters a further three and one third shares representing the shares acquired by him through use of the dividend on the three and one third shares that he held improperly on December 31, 1936, and which that sister should have received upon Nerzeh's death. Other relief, as stated in the margin,[2] is to be given to each

[1] The Central vote of November 6, 1953, can be regarded as a transfer by Beton from his shares improperly charged in the first instance in part to his brothers, since his brothers did not consent to the transfer. Beton, however, is equitably entitled to have the burden of the transfer of three and one third of these shares borne by each of his brothers.

[2] On September 16, 1940, the brothers held a total of one hundred sixty shares, or one hundred eighty shares counting Rachel's former holdings of twenty shares, then in the corporate treasury. Of these shares, the sisters were given ten in 1953 and will receive now a further ten. In September, 1940, the brothers were allowed to subscribe at $200 a share for enough shares to bring the total shares outstanding to five hundred fifty-nine shares, of which the sisters then should have owned twenty. To give the sisters, as of September, 1940, enough additional shares to bring to ten per cent their then holdings would have meant increasing the total shares to five hundred ninety-nine shares of which the sisters should have owned sixty (disregarding inconvenient fractional shares). To adjust for the 1940 transaction, each sister must now be given a right to subscribe to thirteen and one third shares.

In 1947 a further right to subscribe (at a price not disclosed in the record) to an aggregate of seventy-five new shares was given to the brothers. If the

sister in the form of rights to purchase additional Central shares on the same basis given to the brothers in 1940 and in 1947; viz. a right to subscribe to thirteen and one third shares at $200 per share and to three shares at whatever price was charged to the brothers in 1947.

The readjustments made necessary by this case may cause additional administration expenses, and perhaps also some Federal estate taxes and Massachusetts inheritance taxes in Albert's estate and Nerzeh's estate. [1] Beton's conduct has made such additional administration expenses necessary and he must bear them from his own resources. Each brother and sister must bear the burden of one sixth of any estate or inheritance taxes or further claims (other than administration expenses) due in Albert's estate and in Nerzeh's estate, which the Probate Court may find to be owing in these estates and chargeable to the assets transferred to the brothers and sisters. The final decree is to provide that Beton pay these taxes and other claims, if any, in the first instance with the right of reimbursement from his brothers and sisters for their proportionate shares of such amounts. Beton is to be directed to file promptly all appropriate tax returns and probate accounts in each of these estates and to settle them subject to the supervision of the Probate Court in usual course. Where, as here, all the parties are before a court of equity, no useful purpose will be served by requiring the brothers to return to Beton as administrator the shares improperly and prematurely distributed in 1936 before Nerzeh's death and all shares acquired or to be acquired through ownership of such shares. Full and fair relief can be afforded in this proceeding.

With respect to the rights to subscribe above mentioned,

---

sisters had been given rights to purchase enough additional shares to maintain their holdings at ten per cent, a total of eighty-three and one third shares would have been available to all the shareholders, of which the sisters could have subscribed to eight and one third shares. Rounding this figure off to nine shares, each sister must now be given a right to subscribe to three additional shares.

[1] The amount of any such taxes should not be large, for the master found that the "value of Central's stock as of the end of 1934 did not exceed the range of $90 to $110 per share."

the sisters may be without funds to exercise them promptly. Their brothers were able to finance their own stock purchases through Central on favorable terms. The sisters must be given a fair approximation of these terms, and a reasonable market for their rights. Accordingly all the rights issued as a result of the final decree will be freely transferable to any person presently a stockholder of Central and to any other person approved as a stockholder not likely to be detrimental to the best interest of Central after hearing by the Superior Court, following reasonable notice to Central and each of its stockholders. Upon exercise of these rights, shares may be issued to their holders without regard to the existing restrictions on transfer of the shares. Once issued such shares shall be subject to the restriction. The stock purchase rights are to be valid for such reasonable period as may be determined in the Superior Court. The rights issued to each sister to subscribe to three shares (by reason of the increase in shares made in 1947) will be to purchase new shares at the price paid in 1947 by the brothers for their new shares then acquired. This price is not revealed clearly by the record. If not agreed upon by the parties, it is to be determined after further hearing in the Superior Court or before the master.

### CLAIMS ASSERTED IN BEHALF OF CENTRAL AGAINST UNION AND THE BROTHERS.

7. The master found that, "chiefly" because of Beton's "business genius and managerial ability," Central grew and flourished. "[T]he defendants proceeded to expand their . . . operations" either by the purchase of the stock or assets of other corporations or by forming new corporations, including Union. The final decree held the brothers liable to Central for various matters with respect to these corporations, and because of payments to the brothers from Central and Union. No questions, however, with respect to these aspects of the decree are argued in any of the appellants' briefs except those concerning the decree's provisions (a) that each brother holds as constructive trustee for

Central the one third of the stock of Union owned by him; (b) that the brothers are responsible for certain excessive interest paid; (c) that the brothers owe large sums to Central and Union which had been credited over the years to them for expenses; and (d) that the brothers owe Central some $2,000 in respect of a refinancing profit made by them on a certain mortgage. All other questions with respect to these charges, and with respect to corporations other than Union, we regard as waived.

8. The master found that the real estate subject to the mortgage just mentioned was acquired in the names of the brothers for $8,000, with the assistance of a deposit check of Central, charged to the account of the individual defendants. An initial mortgage for $8,000 was refinanced for $10,000 and the $2,000 difference was distributed among the brothers. Central paid taxes and made improvements on the property and operated it for several years. The subsidiary findings amply justified the master in concluding that the brothers held this property, appropriate to and used in Central's business, upon a constructive trust for Central, where "Central was made to incur all of the financial burdens." The final decree properly ordered the brothers to account for this profit.

9. The master found "the following to be the essential facts with regard to Union." Central in 1945 was distributing in the Worcester area at retail 2,500,000 gallons of gasoline per year. It also had a fuel oil business three times as large. In 1945, when each brother was a director and officer of Central, Union was formed to operate a "deepwater fuel oil terminal" near Boston. Beton felt that this "should be a venture by Central." One brother felt that it was "too speculative" and both Kenneth and George thought that it should be owned equally by the brothers. The master found that the brothers "always intended that Union should be an enterprise separate . . . from Central. If there had not been agreement on this point, Union might never have been organized." See *Kaneb* v. *Kaneb*, 334 Mass. 525.

For such a terminal it was necessary to have an oil supply. Texas Company (hereinafter called Texas) had been Central's supplier, and, "as a part of the consideration for . . . [its] contract to supply fuel oil" to Union, it insisted on getting Central out of the retail gasoline business in Worcester County. Accordingly, Central sold its filling station equipment to Texas and leased to Texas several stations. Central also guaranteed Union's account with Texas.

George Kaneb advanced Union $13,500, but other initial funds, about $128,000, "emanated from Central." No cash was paid by the brothers for Union's shares, but Central's advances for Union were "charged in equal amounts on its books" to the three brothers, whose accounts with Central were overdrawn after August 1, 1946. In January, 1947, "Central was . . . owed large sums . . . by Union." The "balance of the funds . . . for the . . . facilities . . . was raised" by a mortgage on Union's properties to a bank for $387,500, guaranteed by Central and secured by Central's assignment of certain leases and by a mortgage of Central's real estate. Other later loans to Union by the same bank were similarly secured and guaranteed. Central made loans without interest to Union and borrowed from a Worcester bank to do so.

In 1945 and 1946 "the primary concern of the defendants was the . . . development of Union . . . and [all] Central's assets . . . were employed by the defendants in . . . attaining . . . that objective. . . . Both Central and Union sell and have sold to some customers in the same areas. There is nothing to indicate that Central could not have obtained the . . . contract with Texas . . . . If Central had undertaken to develop a bulk . . . plant of its own, it would not have had to assume a substantially greater . . . risk than it did by" the assistance it in fact gave to Union. Various Central employees worked for Union but Central was never reimbursed for their salaries.

Fortunately, the Union operation was a complete success. Certain advantages accrued to Central, in terms of discounts "substantially larger than Central could . . . have obtained

from Texas," and, after 1946, "Central earned substantial profits for the first time in its history." Union has granted Central substantial credit without interest. "Central has never been requested . . . to pay so much as a penny" as a result of its guaranties and financing assistance to Union. "The substantial sums advanced by Central to Union in Union's formative stages have been repaid, and Union has dealt fairly with Central in its business relations."

On these facts the master concluded "that Central does not own Union and that the defendants hold their stock in Union free from any . . . trusts in favor of Central." He obviously based this conclusion largely on the consideration that "Union might never have been organized" except for the brothers' agreement that it should be a separate enterprise, and that their "intention should be given effect, unless as a matter of law this cannot be done." He also concluded that to require the brothers to transfer Union's stock to Central "would result in an unjust enrichment to Central" and to Beton who, he found, "could not escape the major portion of the blame" for the wrong done to the plaintiffs through withholding from them their portion of Albert's shares in Central. Such a transfer (notwithstanding the decision in *Kaneb* v. *Kaneb*, 334 Mass. 525) could "result in permitting . . . Beton to acquire complete control of Union through his dominant stock postion in Central."

Although the master "found no constructive trust in favor of Central" with respect to the shares in Union, he did find (1) "that Central was seriously . . . damaged" when Union was organized by the requirement that "Central . . . abandon its gasoline business" to the extent of $75,000 (net after a credit) and (2) that the "wrong . . . can be adequately compensated by . . . money damages." The final decree, however, ordered each brother to transfer his stock in Union to Central. The decree did not charge each brother with $13;200, the subscription price of his Union shares, as the master had recommended be done, presumably on the theory that Central, treated in the decree

as the beneficial owner of the Union shares, ought to pay for them.

The master's conclusions about the Union stock were based expressly on his subsidiary findings. It was open to the trial judge, and is open to us, to draw different inferences from those findings. *McOuatt* v. *McOuatt*, 320 Mass. 410, 411. See *Dodge* v. *Anna Jaques Hosp.* 301 Mass. 431, 435. See also *Foot* v. *Bauman*, 333 Mass. 214, 219. The subsidiary findings reveal an opportunity closely tied into Central's business operations. See cases collected in *Weismann* v. *Snyder,* 338 Mass. 502, 504–505, especially *Durfee* v. *Durfee & Canning, Inc.* 323 Mass. 187, 199, and *Production Mach. Co.* v. *Howe*, 327 Mass. 372, 377–378. Cf. *Black* v. *Parker Mfg. Co.* 329 Mass. 105, 112–113. In exploiting this opportunity the brothers used all of Central's resources without reserve. If they had been the sole stockholders of Central, with no obligation to consider the interests of persons other than themselves, their participation in the arrangements with respect to Union might well have barred Central and any persons thereafter becoming beneficially interested in Central's shares from objecting to the actions of the brothers in accordance with their own desires. See *Hays* v. *Georgian, Inc.* 280 Mass. 10, 17. In the light of the findings that the sisters gained rights indirectly in Albert's shares issued in 1934, the brothers, when they formed Union, were not free, as directors of Central, to take wholly for themselves a business opportunity of Central.

It remains to consider what relief should be granted here. As the master pointed out, if the brothers are required to hold their Union stock in constructive trust for Central, Beton will be the principal gainer, for as he will own nearly fifty per cent of Central's stock (even if the sisters exercise all their rights to purchase such stock) he will, with the sisters, have working control of Union. He will receive nearly fifty per cent of the benefit of the large payments to Union, mentioned below, which the final decree ordered the brothers to make to Union. As Beton as Union's treasurer acquiesced in the transactions giving rise to these payments,

there is obviously no reason why he should benefit from them
at the expense of his brothers. All this "would create a
. . . situation where" Beton, found by the master to be
the principal wrongdoer, "would be unjustly enriched at
the expense of the others."

The trial judge rejected the master's conclusion that
money damages to Central would suffice. We agree with
the trial judge. George and Kenneth, however, now con-
tend that full relief can be given to the sisters by issuing
Union shares to them directly, instead of to Central.

The usual practice in Massachusetts has been to afford
relief in a case of this character to the corporation, on the
ground that the stockholders have only derivative rights
against one who has wronged their corporation. *Hayden* v.
*Perfection Cooler Co.* 227 Mass. 589, 591. *Shaw* v. *Harding*,
306 Mass. 441, 448, and cases cited. Cf. *Von Arnim* v.
*American Tube Works*, 188 Mass. 515, 518–519. In *Old
Dominion Copper Mining & Smelting Co.* v. *Bigelow*, 203
Mass. 159, 190–194, the circumstance that some of the
wrongdoers, as stockholders of the wronged corporation,
would benefit from the corporation's recovery for the wrong
was held no barrier to full corporate recovery. In that case,
however, the circumstances were different in one respect,
for there it was clearly contemplated that members of the
general public, who would be harmed by the undisclosed
breach of the then defendant's fiduciary duties, would shortly
thereafter become stockholders.

The rule that all recovery in cases like the present must
accrue to the corporation is not inflexible. In some other
jurisdictions, direct relief to shareholders, rather than
through the wronged corporation, has been given where
that would more justly apportion the burden of the recovery
among the wrongdoers. *May* v. *Midwest Ref. Co.* 121 F.
2d 431, 439–440 (1st Cir.). *Brown* v. *DeYoung*, 167 Ill.
549, 551, 556, 559 (but see *Chicago Macaroni Mfg. Co.* v.
*Boggiano*, 202 Ill. 312, 320, and *Voorhees* v. *Mason*, 245 Ill.
256, 264–265). *Matthews* v. *Headley Chocolate Co.* 130 Md.
523, 537–538. *Harris* v. *Rogers*, 190 App. Div. (N. Y.) 208,

210–212.  *DiTomasso* v. *Loverro,* 276 N. Y. 551.  *Joyce* v. *Congdon,* 114 Wash. 239, 242–243.  *Jenkins* v. *Bradley,* 104 Wis. 540, 562–563.  See Annotation, 120 A. L. R. 238.  See also *Chounis* v. *Laing,* 125 W. Va. 275, 293–298.  On this issue, *Perlman* v. *Feldmann,* 219 F. 2d 173, 178 (2d Cir.), reaches a similar result, but we have not considered whether in other respects the case would be followed in Massachusetts.

Here greater fairness would clearly be achieved by treating the sisters retroactively precisely as the brothers treated themselves with respect to Union's shares.  This can be done by requiring each brother, who now holds thirty-three shares of Union bought by him for an aggregate price of $13,200 to sell for $1,320 to one of his sisters three and three tenths shares, or ten per cent of his holdings.  No rights of creditors or members of the general public are here involved nor is any public participation in either Central or Union presently contemplated.  No dividends have been paid on Union's shares, as far as this record reveals.  If this is so, upon the satisfaction of the brothers' liabilities to Union, its assets will be intact.  Such relief will give each brother just what he bargained for with his brothers when Union was formed, less what the brothers should have seen that the sisters received, and will prevent Beton's large interest in Central from unjustly giving him practical control of Union.  To be sure, this relief will not give the sisters, through ability to vote either with Beton or with Kenneth and George, the balance of power in both Central and Union.  They, however, would not have received such a balance of power as to Union, when Union was formed, if they had been given merely the chance (on the same basis as was given to each brother) to subscribe to ten per cent of the shares of Union, which was all that their then unrecognized interest in Central's shares would have required the brothers to give them.  In the exercise of a reasonable business judgment, the brothers could properly have formed Union as a separate corporation, so long as they did not take for themselves the advantages of the opportunity and so long as they had fair regard for the minority interests in Central.

On the unusual facts here established, equity should thus flexibly frame relief to do substantial justice and to avoid the unjust enrichment of Beton.  Beton, who agreed to the equal division of Union's shares among the brothers, cannot be heard to object to this method of giving relief.  As the sisters will own ten per cent of the shares both of Central and of Union, they will receive the same indirect stockholder interest (including any recoveries of sums owing from each of the brothers to each corporation) in the assets of each, which they should have had originally.  There will thus be no practical reason for requiring Union to pay to Central the $75,000 net damage caused to Central by Union's activities.  The sisters get their interest in that amount either way.  The decree is to be modified to require a sale of three and three tenths shares of Union stock by each brother to one of his sisters on the terms already mentioned.  The credit to each brother's account with Central for the $13,200 subscription price for his Union shares must be eliminated from the decree.

10. The final decree charged to the brothers the sums stated in the margin[1] for alleged improper withdrawal of selling and travelling expenses, together with interest to the date of the decree.  The master does not state the years covered by the expenses listed as credited by Central.  For Union, the period covered was 1947 through June, 1955, a period of eight and a half years.  The master found as to items "credited on the books of Central" that "automobile and airplane expenses were paid by Central, aside from the above sums"; that "no vouchers to substantiate the . . . expense were introduced, and . . . that in more than ninety-nine per cent . . . of the cases there were no vouchers or receipts for the checks paid to the defendants as travel ex-

[1]

| Due to: | | Owed by: | |
| | Beton | Kenneth | George |
| Central | $ 43,315.00 | $77,964.42 | $ 1,528.96 |
| Union | 84,364.33 | 10,206.10 | 128,517.22 |
| | $127,679.33 | $88,170.52 | $130,046.18 |

pense. It comes down to a question of the burden of proof. If in the absence of any other evidence, the records are controlling . . . the plaintiffs and Central have not sustained the burden of proof. If . . . the burden was upon the defendants to explain the . . . travel expense when . . . challenged, then . . . the defendants did not sustain the burden of proof." With respect to expenses for Union, the master made similar findings, except that he found that certain plane travel in 1955 for George and Kenneth (amounting to $718.08 for the former and $735.88 for the latter) "was for pleasure rather than business." As to the other Union credits and payments "no evidence was introduced either to justify or to cast doubt upon the validity of the . . . items as they appear on the books."[1]

George and Kenneth argue that Beton was treasurer of Central and Union and dominated them at all times and was as general manager in charge of each corporation and its books. They contend that entry of the disputed credits constituted a binding acquiescence in the expenditures by the corporations' duly authorized officer which cannot now be reopened.

An agent or fiduciary is under a duty to keep and render accounts and, when called upon for an accounting, has the burden of proving that he properly disposed of funds which he is shown to have received for his principal or trust. See Restatement 2d: Agency, §§ 382, 399, comment e; see also Restatement: Trusts, §§ 172, 244–245; Scott, Trusts (2d ed.) §§ 172, 244–245.2. Substantially the same principles are applicable to corporate directors and officers. *Little* v. *Phipps*, 208 Mass. 331, 334–335. *Daniels* v. *Briggs*, 279 Mass. 87, 92 (corporate treasurer has burden of substantiating credits to him). *Medford Trust Co.* v. *McKnight*, 292 Mass. 1, 31. *Shaw* v. *Harding*, 306 Mass. 441, 447 (general

---

[1] Kenneth has also been ordered to pay Central for credits to him of legal fees paid in 1938 of $3,520 and an item "J. Sherman Oil Company" in 1941 of $17,625.38. The master found that there was no "evidence as to the propriety and accuracy of these credit entries" and accepted them as true, "unless as a matter of law . . . Kenneth . . . had the burden of proof . . . once they were called into question." These stand on essentially the same basis as the travel expense.

manager in charge of books had burden of proof of proper expenditure). See *Pappathanos* v. *Coakley*, 263 Mass. 401, 407–408 (fiduciary); *Akin* v. *Warner*, 318 Mass. 669, 674–675 (informal investment adviser).

We recognize that even a corporate officer who has acted with scrupulous propriety may be faced with very serious practical problems when called upon to account for expenditures made over a period of years and periodically drawn or reimbursed in accordance with current practice in the particular corporation. In this case, we are not called upon to consider to what extent such an officer may be able to meet his obligation to account by showing in general terms the nature, purpose, and extent of such expenditures, or circumstances[1] which make a requirement of present detailed accounting impracticable and inequitable. Whatever may be the situation where such evidence is offered, the proof here does not show more than that the brothers as directors and officers of Central and Union each received very large sums for expenses. Whether these sums were in reimbursement of expenses already incurred or advances against future expenses does not appear. Doubtless, the brothers had substantial perfectly proper expenses for Central over twenty years and for the eight or more years of Union's operation, but there is no finding (and apparently there was no evidence whatsoever) about the character of any of these expenditures (except the small items of disapproved airline travel already mentioned) or the arrangements under which they were made, or of any periodic accountings for them. There simply is no explanation of what happened to the sums received by the brothers.

---

[1] For example, that he was given a reasonable general annual lump sum or per diem expense allowance; that particular types of expense in a particular line of business are customarily accounted for very generally; that he has already made periodic accountings (perhaps amounting to an account stated) to a proper corporate fiscal or accounting officer; that the expenditures were agreed to in advance, or ratified, by a proper corporate officer or board or by the complaining stockholders (see *Lydia E. Pinkham Medicine Co.* v. *Gove*, 303 Mass. 1, 6–9); that the expenditures were beneficial to the corporation or were made as a matter of business judgment in good faith with reasonable intelligence (see *Murphy* v. *Hanlon*, 322 Mass. 683, 686–687); or that they were approximately in a stated amount, even if because of lapse of time or loss or destruction of records they cannot be proved in detail.

Under the cases already cited, the brothers, as directors and officers of Central and of Union, once the payments and credits to them were shown, were required to explain them and what was done about them in some reasonable manner. At least this initial burden rested upon them, whatever the ultimate burden may have been. Cf. *Columbian Insecticide Co. of Boston* v. *Driscoll*, 271 Mass. 74, 78; *Durfee* v. *Durfee & Canning, Inc.* 323 Mass. 187, 204–205. Since the brothers showed nothing at all when they had the opportunity to do so, the charges made against them in the final decree for the expense credits and payments must stand. There is no merit to the suggestion that Central is barred by the acquiescence in or ratification of the expenditures by Beton and his brothers, the alleged wrongdoers who received the benefit of the credits and payments. See *Silversmith* v. *Sydeman*, 305 Mass. 65, 71.

11. The master found that the brothers caused Central to pay to Walter Heller Company, a private loan company, "excessive rates of interest and . . . minimum charges," because "the continued conflict [of the brothers] . . . as to the control . . . of Union" led a Boston bank to decline "to continue . . . financing . . . Union's accounts receivable" and it became necessary for Central and Union to enter into a "package deal" for receivable loans with Heller. The master also found that the brothers committed a breach of their duty as directors "by committing Central to such exorbitant interest rates . . . and that such commitments were the direct result of the improper conduct of" the brothers who owed a duty to Central not to let their differences "operate to injure Central." There might be doubt whether the brothers could be charged for these items if there had been reasonable necessity for incurring the charges to finance Union. If that had been the case, the plaintiffs should not seek the benefit of the Union operation without allowing the reasonable expenses of making it profitable. See *Central Ry. Signal Co.* v. *Longden*, 194 F. 2d 310, 323–324 (7th Cir.). In view, however, of the master's finding that it was the brothers' controversy which made

usual bank financing impossible, there was justification for holding the brothers responsible for the excessive charges.

12. The plaintiffs made no demand on Central's board of directors before the suit was started. Such a demand was not a condition precedent to suit, where, as the master found, the brothers "were, before and at the time . . . , in complete control" and dominated the board and any requests upon the board "would have been . . . futile gestures and would not have resulted in any effective action . . . by Central." See *Daniels* v. *Briggs*, 279 Mass. 87, 92; *Heise* v. *Earnshaw Publications, Inc.* 130 F. Supp. 38, 41 (D. Mass.).

13. Paragraph 13 of the final decree awarded very substantial fees to counsel for the sisters. No argument about this allowance has been made by any defendant. On the present record (see *Phelps* v. *State St. Trust Co.* 330 Mass. 511, 513) we have not passed upon its propriety and should not be taken to have approved it. As was said by Rugg, C.J., in *Sagalyn* v. *Meekins, Packard & Wheat Inc.* 290 Mass. 434, 441, the allowance of counsel fees "is a matter which easily may become subject to abuse. It commonly rests in sound judicial discretion." See, however, *Shaw* v. *Harding*, 306 Mass. 441, 450–451; *Commissioner of Ins.* v. *Massachusetts Acc. Co.* 318 Mass. 238, 241–246. Cf. *Hayden* v. *Hayden*, 326 Mass. 587, 596–597, laying down standards appropriate for application in closely analogous cases. Cf. also *Abrams* v. *Loew*, 335 Mass. 96, 100, and cases cited. Here Central was represented by its own experienced counsel. There exists in such a case serious possibility of duplication of effort which must be taken into account.

14. The interlocutory decree is reversed and a new interlocutory decree is to be entered (a) containing the provisions of pars. 1, 2, and 7 of the old interlocutory decree; (b) sustaining the plaintiffs' exceptions to the master's report numbered 1 to 7, inclusive, and modifying in a manner consistent with this opinion action upon the plaintiffs' exceptions numbered 8, 9, 10, and 11; (c) modifying in a

manner consistent with this opinion action with respect to Central's exceptions numbered 1, 7, 8, and 9, and sustaining Central's exceptions numbered 2 to 6, inclusive; (d) overruling the exceptions of George and Kenneth Kaneb and Union numbered 1 to 12, inclusive, 16 to 23, inclusive, 26 to 33, inclusive, and modifying in accordance with this opinion action upon their exceptions numbered 13, 14, 15, 24, and 25; and (e) overruling all Beton's exceptions other than that numbered 4, which is to be sustained. The final decree is reversed. A new final decree is to be entered which is to contain the substance of pars. 3, 5 to 12, inclusive, and 14 of the old final decree, except that the credits in pars. 10 (c), 11 (e), and 12 (d) of $13,200 with interest are to be eliminated, and that appropriate adjustment of the credits of $32,306.79 in pars. 7 (g), and 8 (g), and of $32,373.40 in par. 9 (h) are to be made in a manner consistent with this opinion, and also is to contain (a) a revision of pars. 1 and 2 of the old final decree to provide in a manner consistent with this opinion for the somewhat different distribution of Central stock and stock purchase rights and other incidental relief directed in section 5 of this opinion; (b) a revision of par. 4 of the old final decree, in a manner consistent with this opinion, to provide that each brother shall transfer to one of his sisters three and three tenths shares of Union stock upon payment to him of the sum of $1,320; (c) provisions requiring all corporate action by Central and Union appropriate to the execution of the new final decree; (d) injunctions against Central and Union preventing, without special leave of court, any dividend distribution or transfer of assets, not in the usual course of business or pursuant to the new final decree, until that decree has been fully performed; and (e) a provision retaining jurisdiction in the Superior Court to supervise the execution of the new final decree, including jurisdiction to order any reasonable or appropriate modification of the corporate arrangements directed by that decree which may become desirable in the course of executing it. No further award of counsel fees is to be made by reason of this appeal,

but this shall not prevent Central and the brothers from paying to their own counsel, respectively, reasonable fees for their services and expenses in connection with this appeal. Paragraph 13 of the old final decree may be included in the new final decree unless the trial judge of his own motion or on motion of any party is of opinion that reduction of the allowance therein contained is required. The plaintiffs and Central are to have costs of this appeal.

*So ordered.*