WOODROW S. WILSON & another *vs.* CLIFFORD R. JENNINGS
& others
(and a companion case).

Suffolk. Middlesex.    April 2, 1962. — June 27, 1962.

Present: WILKINS, C.J., SPALDING, CUTTER, KIRK, & SPIEGEL, JJ.

*Corporation,* Officers and agents, Stockholder, Issue of stock.    *Joint Enterprise.  Fiduciary.  Contract,* Of employment, Validity.    *Equity Jurisdiction,* Laches, Plaintiff's clean hands, Accounting, Joint enterprise, Stockholder's suit, Change in situation during suit, Retention of suit for further relief.    *Laches.  Unfair Competition.  Equity Pleading and Practice,* Injunction, Suit to enjoin competition, Bill.

At the trial of a stockholders' derivative suit for the benefit of a corporation which originally had issued ten shares to each of the two plaintiffs and ten shares to the defendant, and of a suit by the same plaintiffs to cancel stock issued by the corporation to the defendant after the original issue, a finding by the judge that each of the plaintiffs owned stock in the corporation and had standing to maintain the suits was warranted by evidence that the defendant himself had asserted that both plaintiffs had paid into the corporation's treasury sufficient value for their stock and that such payments were reflected on an audited balance sheet of the corporation.    [614]

At the trial of suits in equity by two stockholders of a corporation formed to exploit an invention against its third stockholder, who was the manager and an officer and a director of the corporation, evidence warranted findings that the plaintiffs and the defendant "agreed to be equal one-third owners" of the corporation with permanent equal division of stock, that "throughout the transactions" involving the corporation since its

formation the plaintiffs "reposed a great . . . trust" in the defendant, that there was a "mutual understanding" among the three for disclosure of relevant information, that they had entered into a joint venture in corporate form, and that a fiduciary relationship existed among them. [614–615]

At the trial of a suit in equity by two plaintiffs each owning one third of the stock of a corporation founded as a joint venture with the defendant, the owner of the remaining one third of the stock, in which a "permanent" equal division of the stock was contemplated and the parties had a "mutual understanding" for disclosure of relevant information and stood in a fiduciary relationship to one another, evidence warranted findings that the defendant did not disclose, either directly or indirectly, to the plaintiffs a contract whereby the corporation would employ him in all its key positions for sixteen years at a salary plus commissions and with a right to convert any indebtedness of the corporation to him into voting stock, that such nondisclosure in the circumstances was a breach of the defendant's fiduciary duty to the plaintiffs, and that the contract was void, even though the defendant was entitled to reasonable compensation from the corporation for his services as manager, president, treasurer, and a director. [615–616]

Evidence at the trial of a stockholders' derivative suit against one who was a stockholder, the manager and an officer and a director of the corporation for which the suit was brought warranted findings by the judge that a contract of the corporation and a second corporation in which the defendant became a director and the treasurer and, with his wife, the owner of one half of the stock, whereby the second corporation received "the exclusive right to manufacture" products of the first corporation over a period of nineteen years, was an attempt by the defendant to seize for his own benefit an advantageous opportunity which belonged to the first corporation and that the contract was void. [616–617]

Conclusions were warranted that a stock subscription plan voted by the directors of a Massachusetts corporation on April 30, giving each of its three stockholders an option until May 8 to purchase up to sixty new shares at $450 per share and requiring payment by May 12, did not allow reasonable time for decision to two stockholders residing in California who on May 4 received notice of the option mailed on May 2, and that in the circumstances an issue of stock to the third stockholder and his wife pursuant to the plan was invalid. [617]

It might properly be concluded in the circumstances that minority stockholders of a corporation did not ratify a contract of the corporation by a vote adopted at a stockholders' meeting at which they were represented by a proxy, where there was evidence that the existence of the contract was not disclosed to them until it was disclosed to the proxy at the meeting and that he then objected to everything that the majority stockholder "could do on the basis of . . . holding" a majority of the stock. [617–618]

Upon the facts appearing at the trial of suits in equity by two of three original and equal stockholders of a corporation against the third original stockholder, who was an officer and a director of the corporation,

the judge was not required to conclude that a delay of three months on the part of the plaintiffs in bringing suit after learning of an improper stock subscription plan approved by the directors constituted laches; nor was any conduct by the plaintiffs shown which precluded granting them relief on the ground of unclean hands.   [618–619]

It would be a proper condition of equitable relief sought by two of three equal stockholders of a corporation in suits in equity against the corporation and the third stockholder and his wife, to whom the corporation was indebted for salary, loans and other items, that the plaintiffs and the corporation afford an accounting to the individual defendants for the amounts owed to them.   [619]

A final decree in a stockholders' derivative suit for the benefit of a corporation formed as a joint enterprise to exploit an invention, permanently enjoining the defendants, directors and officers of the corporation, from engaging in activities involving articles "which are in any respects similar to or competitive with" those dealt in by the corporation, was too broad in the circumstances.   [620]

On the record of appeals from final decrees in suits in equity by stockholders of a corporation against it and a stockholder, officer and director of the corporation and his wife, adjudging that certain contracts of the corporation arranged by the individual defendants were void and certain stock of the corporation issued to them invalid, and granting the plaintiffs other relief, there was no error in a provision in the decree in each case requiring the individual defendants to pay the corporation a sum for its counsel fees and expenses, but the decrees should have indicated to which counsel payments were to be made and in what amounts.   [621]

A demurrer attacking as multifarious the bill in a stockholders' derivative suit was properly overruled where the various issues were closely interrelated and based upon the same transactions.   [621]

Upon affirming as modified a final decree favorable to the plaintiffs in a suit in equity, this court, having had brought to its attention by affidavit of the defendant certain actions of the plaintiffs after the entry of the decree, directed the trial court to retain jurisdiction in order to make appropriate adjustments in the decree to reflect events occurring after the entry of the original decree.   [622]

Two BILLS IN EQUITY filed in the Superior Court on August 4, 1959.

The suits were heard by *Tomasello,* J., on demurrers, and by *DeSaulnier,* J., on the merits.

*Meyer H. Goldman (Herbert L. Sostek & James A. King, Jr.* with him) for the defendants.

*Joseph Ford* for the plaintiffs.

CUTTER, J.   These two bills in equity were brought by Wilson and one Malick, stockholders of Polytop Corpora-

tion (Polytop), a Massachusetts corporation. The first suit (the Suffolk case) is a stockholders' derivative bill against Jennings, Polytop, Amberland Corporation, Inc. (Amberland), Mrs. Jennings (clerk and a director of Polytop), O'Neil (a director of Polytop), and Kubiliunas, president of Amberland. The second suit (the Middlesex case), brought by the plaintiffs in their own behalf, is against Jennings, Mrs. Jennings, O'Neil, and Polytop. Demurrers to each bill were overruled. After hearing the cases on the merits, the trial judge made voluntary findings of fact. A final decree was entered in each case, in substantially all respects favorable to the plaintiffs. The defendants, in each case, appealed from the interlocutory decree overruling the demurrer and from the final decree.[1]

No request was made in either case for a report of material facts under G. L. c. 214, § 23 (as amended through St. 1947, c. 365, § 2). Even if the judge's voluntary findings were not sufficient by themselves to sustain the decree, it will not be reversed if the reported evidence shows that the decree nevertheless was right. See *Barnhart* v. *Board of Appeals of Scituate,* 343 Mass. 455, 457. See also *Birnbaum* v. *Pamoukis,* 301 Mass. 559, 561–562; *Matter of Loeb,* 315 Mass. 191, 195; *Thomas W. Watkins & Son, Inc.* v. *Amesbury,* 338 Mass. 796; *Johnson* v. *McMahon, ante,* 348, 351. Cf. *Corkum* v. *Salvation Army of Mass. Inc.* 340 Mass. 165, 166. These findings (supplemented in minor respects by the evidence) are summarized below.

In 1955 Wilson and Malick, each a resident of California, and one Carabel invented a plastic top for containers of liquids or powders. They assigned to Poleete, Inc., a California corporation controlled by Wilson and Malick, the exclusive right for twenty years to make and sell the top. In December, 1956, Wilson and Malick agreed with Jennings upon the formation of Polytop to promote the top. One third of the stock was to be held by each of them. Jennings was to manage Polytop and Wilson and Malick were to cause Poleete, Inc., to assign to Polytop "all of Poleete,

---

[1] The appeals of Kubiliunas and Amberland in the Suffolk case were not perfected.

Inc.'s . . . interest in . . . [the] plastic tops.'' Polytop
was formed. Wilson, Malick, and Jennings each became
the owner of ten shares of Polytop stock. The assignment
from Poleete, Inc., to Polytop took place on January 21,
1957. Jennings became president and treasurer of Polytop
and Jennings, O'Neil, and one Mildred Kent became its
directors. Jennings spent "a great deal of time and money
in furthering the interest of Polytop.''

On August 1, 1957, Jennings entered into an employment
contract with Polytop under which he was to be employed
until August 1, 1973, at what essentially was a minimum
salary of $15,000 per year plus a commission on the total
sales of plastic tops. Under the agreement Jennings could
convert into voting stock any indebtedness of Polytop to
him at the rate of one share for each $1,000 of debt. Al-
though he was in almost daily communication with Wilson
and Malick, Jennings did not disclose this contract until a
meeting on February 25, 1959. On February 14, 1959, Jen-
nings had issued an additional thirty shares of Polytop to
himself pursuant to the employment contract, and these
shares were voted at the meeting on February 25, 1959.
These shares were sold back to Polytop (as the evidence
shows, on April 29 or 30, 1959).

Polytop and Amberland executed a contract by which
Amberland received "the exclusive right to manufacture
Polytop products over a period of 19 years and . . . the
right to change prices'' (a right to be exercised, as the evi-
dence shows, "by mutual agreement''). Jennings became
a director of Amberland and its treasurer, and 15,000 of its
30,000 shares were issued to Jennings and his wife.[2]

In February, 1959, Polytop was negotiating with a firm
known as Lambert & Co. for financing assistance. Wilson
urged Jennings not to issue further stock until these nego-

---

[2] The evidence shows that Jennings paid for his Amberland stock in the fol-
lowing manner. He acquired certain molds from Polytop in return for a
$15,000 reduction of Polytop's debt to him. The molds he transferred to
Amberland, subject to the right in Polytop to reacquire the molds over a
period of time by instalments. The precise cost of the molds to Polytop and
to Jennings is not clear from the evidence.

tiations had ended.    On April 30, 1959, each shareholder of
Polytop was offered a chance to subscribe to sixty new
shares at "$450 per share with a time limit of May 8, 1959,
on the exercising of this purchase."    Notice of this was
mailed on May 2, 1959, by Jennings and received on May 4
by Wilson and Malick.    The judge concluded that "the
mailing of the notice on May 2nd to California with an ex-
piration date of May 8th should not be construed as giving
the other stockholders reasonable time to subscribe."    He
ruled that it was improper to issue (on May 12) new Poly-
top shares to Jennings and his wife, and ordered that such
shares be cancelled.

The final decree in the Suffolk case (a) declared that Wil-
son, Malick, and Jennings each owned only the ten shares
issued to them, respectively, in January, 1957, and ordered
that all shares issued thereafter be cancelled; (b) declared
void the employment contract with Jennings of August 1,
1957, the contract with Amberland of July 1, 1958, and all
proceedings taken at the stockholders' meetings of Febru-
ary 3 and 25, 1959; (c) ordered Jennings and his wife to
transfer to Polytop all their Amberland shares and to pay
to Polytop all dividends received from Amberland; (d) de-
clared invalid all guaranties and indorsements by Polytop
of Amberland's obligations; (e) ordered Jennings and his
wife to make available to Wilson and Malick all documents
belonging to Polytop; (f) directed Jennings and his wife to
refrain from entering into or carrying out any agreements
for the manufacture of the plastic tops by anyone other than
Polytop and to disclose all such agreements; (g) enjoined
the defendants other than Polytop in broad terms (see fn. 4,
*infra*) from competition with Polytop and from divulging
processes and trade secrets; and (h) ordered Jennings and
his wife to pay $5,000 to Polytop for expenses and counsel
fees.    The findings of fact in the Middlesex case were sub-
stantially the same as those in the Suffolk case.[3]

---

[3] The final decree in the Middlesex case declared void all stock of Polytop
issued since January, 1957, the stockholders' meetings in February, 1959, and
the employment contract.    It ordered Jennings and his wife to make available
to Wilson and Malick all Polytop records, and to pay $1,000 to Polytop for
its counsel fees and expenses.

1.   The judge justifiably found that Wilson and Malick each owned ten shares of Polytop's stock and thus had standing (see *Mendelsohn* v. *Leather Mfg. Corp.* 326 Mass. 226, 237) to maintain these suits.   The trial judge did not abuse his discretion in denying the defendants' motion to amend each answer.   See G. L. c. 231, § 51; *Knox* v. *Springfield,* 273 Mass. 109, 110–111; *Abbott* v. *Bean,* 285 Mass. 474, 478–479; *Smith* v. *Miles,* 296 Mass. 126, 129; *Fryefield* v. *Boston Diaper Serv. Inc.* 338 Mass. 401, 404.   Although the evidence was confusing, exhibits showed that Jennings himself had asserted that both Wilson and Malick had paid into Polytop's treasury at least sufficient value to support (see G. L. c. 156, § 15) the issue of ten shares of no par stock to each of them, and that such payments were reflected on an audited balance sheet of Polytop as at December 31, 1958.

2.   We cannot say that the trial judge, upon conflicting evidence, was plainly wrong in concluding (a) that Wilson, Malick, and Jennings "agreed to be equal one-third owners of . . . Polytop . . . with the stock ownership to be divided equally"; (b) that "throughout the transactions . . . Wilson and Malick reposed a great . . . trust in . . . Jennings"; and (c) that "Jennings . . . owed a duty of disclosure to . . . Wilson and Malick" with respect to the employment contract and the Amberland contract.   The relations of the parties in respect of Polytop were stated in part in the corporation's by-laws and other corporate documents (see *Bushway Ice Cream Co.* v. *Fred H. Bean Co.* 284 Mass. 239, 244–245; *Crocker* v. *Waltham Watch Co.* 315 Mass. 397, 402), and it could have been found that in these documents the agreements of the parties had been merged. Nevertheless, it was open to the judge on the evidence to find that Wilson, Malick, and Jennings, on an informal and somewhat ambiguous basis (cf. *Samia* v. *Central Oil Co. of Worcester,* 339 Mass. 101, 109), had entered into what was essentially a joint venture in corporate form to exploit the plastic top invention; that Jennings was obligated in order "to get his third [share of the stock] . . . to do the financing" and to "be . . . [g]eneral [m]anager of the

business, and operate it on behalf of the stockholders''; and that there was a ''mutual understanding that . . . [Wilson and Malick] would know what was going on'' on the east coast and that they in turn would keep Jennings informed of their own activities. There was evidence that the three way equal division of stock was to be ''permanent.''

If the parties arranged for a permanent equal participation in Polytop's operations, and undertook the obligation of disclosure to one another of relevant information, a fiduciary relationship arose, in addition to that (see *Spiegel* v. *Beacon Participations, Inc.* 297 Mass. 398, 410–411) between Jennings, as a director, and Polytop. The evidence justified the conclusion that the relationship was to be one of trust and confidence. See *Sher* v. *Sandler,* 325 Mass. 348, 353; *Mendelsohn* v. *Leather Mfg. Corp.* 326 Mass. 226, 233. Cf. *Cardullo* v. *Landau,* 329 Mass. 5, 8–9.

3. There was evidence that Jennings gave up another position to undertake to manage Polytop and that his operations for Polytop resulted in a material development of its business and improvement of its product. He made special efforts to obtain financing. There is no reason to suppose that Jennings's services were to be donated to Polytop. He was entitled to reasonable compensation. See *Uccello* v. *Gold'n Foods, Inc.* 325 Mass. 319, 326–327; *Black* v. *Parker Mfg. Co.* 329 Mass. 105, 116.

That Jennings was entitled to compensation, however, does not necessarily justify the employment contract. By that contract, negotiated wholly by Jennings and Polytop's directors controlled by him, he arranged (a) for his holding for an unreasonable period (viz. from 1957 to 1973; cf. *Thalin* v. *Friden Calculating Mach. Co. Inc.* 338 Mass. 67, 70; cf. also *Phelps* v. *Shawprint, Inc.* 328 Mass. 352 355) all the key positions in Polytop, in effect at a minimum salary of $15,000, and (b) for an option to convert certain advances by him to Polytop into new shares at $1,000 per share. The exercise of the conversion privilege, of course, would destroy the equal division of shares among Wilson, Malick, and Jennings, which the judge found to have been contemplated.

The manufacturing contract with Amberland dated July 1, 1958, was to last through 1977. We need not consider whether making such a contract would have been within Jennings's managerial powers, if the contract had been limited to a reasonable period of time, if Jennings had owned no interest in Amberland, and if it had been negotiated with Amberland at arm's length by Jennings, acting solely in the interests of Polytop. There was evidence that Jennings and Mrs. Jennings (and, perhaps, also O'Neil) owned in the aggregate half the stock of Amberland and that Jennings had transferred to Amberland molds (see fn. 2, *supra*), useful in Polytop's business, acquired by Jennings in part settlement of Polytop's debt to him.

The judge justifiably found that the employment contract was not disclosed, either directly or indirectly, to Wilson and Malick until February 25, 1959. In the circumstances, this nondisclosure could be found to be a breach of a fiduciary duty of disclosure owed by Jennings to Wilson and Malick.

Even if Jennings could properly have received a fair employment contract running for a reasonable time, negotiated in good faith (cf. *Winchell* v. *Plywood Corp.* 324 Mass. 171, 176-179), with full disclosure of the circumstances to Polytop's other stockholders, the judge might properly conclude that this employment contract could not stand. Particularly was this so, in view of the provision for the conversion of debt into stock in violation of the understanding that there would be an equal division of Polytop's stock. See *Odman* v. *Oleson,* 319 Mass. 24, 25. See also *L. E. Fosgate Co.* v. *Boston Mkt. Terminal Co.* 275 Mass. 99, 107–108. Cf. *Meyer* v. *Fort Hill Engraving Co.* 249 Mass. 302, 305–306; *Mansfield* v. *Lang,* 293 Mass. 386, 390-391. This conclusion was permissible, even though Polytop's by-laws provided that the directors were to have all Polytop's corporate powers (except as otherwise dealt with in the by-laws) and that no contract was to ''be affected or invalidated by'' the circumstance that a director was a director or officer of another corporation or might be interested in

the contract. Cf. *Spiegel* v. *Beacon Participations, Inc.* 297 Mass. 398, 416–417. Similarly, the judge could justifiably conclude that the Amberland contract was not merely action by Jennings within the range of his proper business judgment as an officer and director of Polytop (cf. *Black* v. *Parker Mfg. Co.* 329 Mass. 105, 112–114), but an attempt to seize for his own benefit an advantageous opportunity which belonged to Polytop. See *Durfee* v. *Durfee & Canning, Inc.* 323 Mass. 187, 196–199; *Production Mach. Co.* v. *Howe,* 327 Mass. 372, 377–378; *Samia* v. *Central Oil Co. of Worcester,* 339 Mass. 101, 122. See also *Weismann* v. *Snyder,* 338 Mass. 502, 504–505. Cf. *Lincoln Stores, Inc.* v. *Grant,* 309 Mass. 417, 423.

The option, voted by the directors on April 30, 1959, to each shareholder to purchase up to sixty shares of new stock at $450 per share was to expire at 2 p.m. on May 8, and new shares subscribed for had to be paid for by 2 p.m. on May 12. Notice of the subscription proposal reached Wilson and Malick in California on May 4. The judge was justified in concluding that, in the circumstances, any stock issue pursuant to the option was invalid because an unreasonably short time (cf. *L. E. Fosgate Co.* v. *Boston Mkt. Terminal Co.* 275 Mass. 99, 106) had been allowed to Wilson and Malick to decide whether to exercise their subscription rights and to pay the $27,000 needed to exercise the rights in full.

At a Polytop stockholders' meeting on February 25, 1959, Wilson's nephew, then a law student, was present as proxy for Wilson and Malick. The minutes show that a somewhat ambiguous vote was adopted, approving the actions of Polytop's officers and directors during the preceding year, subject to Malick's and Wilson's objections to the issue (then disclosed) of thirty shares of stock to Jennings and his wife under the debt conversion privilege in the employment contract. The nephew testified, however, that the ratification did not include the employment contract and the Amberland contract. Although this evidence may have been shaken on cross-examination, the judge was not required to

find that the nephew for his principals had ratified the two contracts, where the nephew had testified that he had objected to everything Jennings and his wife "could do on this basis of . . . [their] holding" a majority of Polytop's stock as a consequence of the sudden debt conversion. Cf. *Braunstein* v. *Devine*, 337 Mass. 408, 413. There was ample basis for the conclusion that there had not been such seasonable and full disclosure as the circumstances reasonably required if any ratification of the two contracts was to be effective. See *Sher* v. *Sandler*, 325 Mass. 348, 353–355. See also *Durfee* v. *Durfee & Canning, Inc.* 323 Mass. 187, 202–203. Cf. *Mendelsohn* v. *Leather Mfg. Corp.* 326 Mass. 226, 236.

4. Wilson and Malick brought these suits on August 4, 1959, with respect in part to matters about which it has been found they first learned on February 25, 1959. There were good reasons for their inaction in the interval. Negotiations with Lambert & Co. went on until late April. The thirty shares of Polytop stock converted by Jennings under the employment contract were returned by him to Polytop on April 30, 1959. The final breach between Wilson and Malick, on the one hand, and Jennings, on the other, appears to have been precipitated by the stock subscription plan approved by the directors on April 30, 1959, of which Wilson and Malick learned only on May 4, 1959. The judge was not required to conclude that a delay of three months thereafter in bringing suit constituted laches.

5. Jennings contends that Wilson and Malick do not come into court with clean hands. Wilson and Malick were stockholders in Poleete, Inc., and Wilson was a trustee for the other stockholders of Poleete, Inc. There was evidence that these stockholders approved of Wilson's stock ownership in Polytop. Wilson could reasonably feel that his primary obligation was to the beneficiaries of his trust, rather than to Polytop, of which (unlike Jennings) he was neither an officer nor a director. As stockholders in Polytop, Wilson and Malick were free to take with respect to Polytop's operations that position which seemed to them most likely

to advance those interests which they owned or represented in the joint venture. Although Jennings, perhaps with some justification, contends that Wilson's and Malick's position (in the negotiations with Lambert & Co.) was unreasonable and hampered his own efforts to obtain financing for Polytop, they were not obliged, against their judgment, to agree to terms insisted upon by Lambert & Co. as a condition of financing Polytop. We perceive no conduct by Wilson and Malick which required the judge to deny them relief in equity as to the matters of which they complain. See *Deutschmann* v. *Board of Appeals of Canton,* 325 Mass. 297, 299–300; *Thayer Co.* v. *Binnall,* 326 Mass. 467, 483–484; Pomeroy, Equity Jurisprudence (5th ed.) §§ 397–404, 941. Cf. *Berman* v. *Coakley,* 243 Mass. 348, 355–356; *O'Gasapian* v. *Danielson,* 284 Mass. 27, 34–35.

6. The relief granted by the final decrees seems in one respect incomplete. In another respect it is too broad.

Polytop was indebted to Jennings. Jennings and his wife have been directed to deliver to Polytop all the shares of Amberland acquired by them. For these they paid a consideration (see fn. 2, *supra*). Wilson and Malick in their bills prayed for an accounting. To complete adjustment of pending controversies (see *Atlantic Natl. Bank* v. *Hupp Motor Car Corp.* 300 Mass. 196, 202) and as a proper condition of equitable relief, they and Polytop should afford an accounting to Jennings and his wife for the amounts owed to them for salary, loans, and other items, including any amount due to them on account of the Amberland shares to be transferred to Polytop. See *Cann* v. *Barry,* 293 Mass. 313, 317–318. See also *Lincoln Stores, Inc.* v. *Grant,* 309 Mass. 417, 423–424; *Lang* v. *Giraudo,* 311 Mass. 132, 139–140; Restatement: Restitution, § 194, comment b, § 199.

Because the amount to be paid by Polytop for the Amberland shares must be determined after appraising oral testimony, it should be done, in the first instance at least, in the trial court. In the course of an accounting between Polytop and Jennings, it may also appear that Polytop is entitled to have Amberland return the molds transferred by

Jennings to Amberland in exchange for half its stock. If the facts require such relief, it may be granted in connection with the accounting, with such adjustments in the accounting as may be appropriate.

Paragraph 10 of the final decree in the Suffolk case enjoins all the defendants other than Polytop very broadly from activities competitive with Polytop. The injunction is so inclusive that it may prohibit activities by some of the defendants from which they should not be barred. See *Building Commr. of Medford* v. *C. & H. Co.* 319 Mass. 273, 284. For example, it may preclude Jennings from exercising certain foreign patent rights in the plastic top invention which, so the evidence indicates, have been assigned to him.[4] The relief thus granted is beyond that sought in the bill. We have been referred to no sufficient basis in the evidence for such a broad injunction. Doubtless, while any joint venture in corporate form continued and while Jennings was a director and officer of Polytop, Jennings and his wife were bound to act only in its best interests. They may properly be restrained from divulging trade secrets and other confidential information obtained by them in a fiduciary capacity. In the absence of an express or implied covenant not to compete after the termination of the common enterprise (or of some proof of special necessity and legal basis for injunctive protection of the subject matter of the enterprise and of Jennings's employment), the broad injunction against competition is not justified. See Levin, Non-Competition Covenants in New England: Part II, 40 B. U. L. Rev. 210, 216 et seq. Cf. *Tobin* v. *Cody,* 343 Mass. 716, 723–724. Paragraph 9 of this decree also appears to be susceptible of too broad application in similar respects. Both paragraph 9 and paragraph 10 must be

---

[4] Paragraph 10 enjoins these defendants ''from engaging directly or indirectly in any acts, transactions, or businesses involving the manufacture, sale or distribution of container closures *which are in any respects similar to or competitive with* those now or heretofore manufactured or sold by Polytop . . . and from divulging to others any information relating to the methods . . . trade secrets or customers of Polytop . . . or relating to customers of Amberland . . . to the extent that such customers are related to the business or products of Polytop'' (emphasis supplied).

limited to the period of service of Jennings and his wife as officers and employees of Polytop, except as to (a) restraining the nondisclosure by them of trade secrets and confidential lists, and (b) requiring disclosure (see par. 9 of the decree) of agreements with others to make, sell, or distribute closure devices, entered into by them while officers or employees of Polytop, unless, after such further hearings as may take place, adequate basis for broader injunctive relief appears to exist.

7. There was no error in requiring Jennings and his wife to pay an aggregate of $6,000 to Polytop to enable it to pay counsel fees, costs, and expenses in each case. Awards of this type, in such cases, commonly rest in sound judicial discretion. *Sagalyn* v. *Meekins, Packard & Wheat Inc.* 290 Mass. 434, 440–441. *Samia* v. *Central Oil Co. of Worcester,* 339 Mass. 101, 129. The court, however, appropriately should have indicated to which counsel payments were to be made and in what amounts. Also provision should be made for offsetting these payments by Jennings and his wife pro tanto against amounts owed to them by Polytop. See *Shaw* v. *Harding,* 306 Mass. 441, 450–451; *Carilli Constr. Co.* v. *John Basile & Co. Inc.* 317 Mass. 726, 736.

8. The bill in the Middlesex case adequately alleges facts which could give rise to a special fiduciary obligation of Jennings to the plaintiffs which might justify equitable relief to them. Cf. *Andersen* v. *Albert & J. M. Anderson Mfg. Co.* 325 Mass. 343, 347–348. Cf. also *Mairs* v. *Madden,* 307 Mass. 378, 382–383. That bill, in any event, properly seeks declaratory relief.

The only ground of demurrer argued by the defendants in the Suffolk case is that the bill is multifarious. This contention is without merit. The various issues in each case are closely interrelated and based upon the same transactions. Nothing requires that they be considered in separate proceedings. See *Peterson* v. *Hopson,* 306 Mass. 597, 610. Cf. *Whitney* v. *Whitney,* 296 Mass. 13, 15, *S. C.* 299 Mass. 547; *Defiance Printed Circuit Corp.* v. *Goodwin,* 337 Mass. 473, 476. The demurrers were properly overruled.

9.  By affidavit, Jennings has brought to the attention of the court certain actions of Wilson and Malick after the entry of the final decrees.   To adjust the present controversies and to cause the decrees after rescript to reflect the situation existing when those decrees are entered further proceedings before the Superior Court may be appropriate.   See *McDade* v. *Moynihan,* 330 Mass. 437, 443–444. Whether this will be the case is for determination in the Superior Court.

10.  The final decree in the Middlesex case is to be modified to provide for offsetting (in the accounting to be had in the Suffolk case) the $1,000 payment ordered to be made to Polytop by Jennings and his wife against a like amount owed to them by Polytop, and for designation of the counsel who are to receive fees from the $1,000 payment.   Also jurisdiction is to be retained to make any appropriate adjustments in the final decree to reflect events which have occurred after the entry of the original final decree.   As so modified that final decree is affirmed.   Paragraphs 9 and 10 of the final decree in the Suffolk case are to be revised in a manner consistent with this opinion, and provision is also to be made in the decree for retention of jurisdiction by the Superior Court (a) to complete a full accounting between Polytop and Jennings and his wife, and (b) to make any appropriate adjustments in the decree to reflect events occurring after the entry of the original final decree.   As so modified the final decree in the Suffolk case is affirmed.   In each case, the interlocutory decree overruling the demurrer is affirmed.

*So ordered.*