**L. Stanley CRANDALL, Plaintiff,**

v.

Clement V. CONOLE, Charles E. Anable, Richard C. Conole, Bridwell W. Lincoln, William J. Callahan, Alva M. Meyers, Defendants.

**Civ. A. No. 35047.**

United States District Court
E. D. Pennsylvania.

June 25, 1964.

Richard P. Brown, Jr., Philadelphia, Pa. (Morgan, Lewis & Bockius, Philadelphia, Pa., Havens, Wandless, Stitt & Tighe, New York City, of counsel), for plaintiff.

Gilbert W. Oswald, Thomas G. Meeker, Tom P. Monteverde, Philadelphia, Pa. (Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., of counsel), for defendants.

CLARY, Chief Judge.

This is an action by L. Stanley Crandall, plaintiff (hereinafter called "Crandall"), against Clement V. Conole (hereinafter called "C. V. Conole"), Charles E. Anable (hereinafter called "Anable"), Richard C. Conole (hereinafter called "R. C. Conole"), Bridwell W. Lincoln (hereinafter called "Lincoln"), William J. Callahan (hereinafter called "Callahan"), and Alva M. Meyers (hereinafter called "Meyers"), defendants. Crandall and C. V. Conole each own 300,000 shares, each comprising 50%, of the outstanding shares of common stock (total issued 600,000 shares) of Business Supplies Corporation of America (hereinafter called "BSC"), a corporation organized and existing under the laws of the Commonwealth of Massachusetts. The remaining five defendants are Officers and Directors but not stockholders of BSC.

The case is presently before this Court for disposition of the following motions: (1) Plaintiff's motion for preliminary injunction (Docket Paper #3), including the amendment to said motion (Docket Paper #16); (2) Plaintiff's motion to hold defendants in civil contempt (Docket Paper #9); (3) Defendants' motion for preliminary disposition of motion for dissolution of temporary restraining order and to dismiss complaint (Docket Paper #7); (4) Defendants' motion for dissolution of temporary restraining order and to dismiss complaint (Docket Paper #8); (5) Defendants' amended motion for dissolution of temporary restraining order and to dismiss complaint (Docket Paper #13). Extensive hearings were held covering many trial days, briefs and requests for findings of fact and conclusions of law have been submitted (Docket Papers #17, #18 and #19), and argument has been had there-

on, at the conclusion of which the Court took the matter under advisement.

As the case unfolded, it became increasingly clear to the Court that an extra-judicial adjustment of the differences between the parties would be the most sensible solution of the entire controversy and advantageous to all concerned. Several times during the course of the hearings, the Court urged counsel to attempt to effectuate such an adjustment, to which end, a series of conferences took place between respective counsel, and the plaintiff and C. V. Conole individually, without counsel. These conferences began during the hearings and continued long after they had ended, but the parties failed to reach an accord. At this point, the writer of this Opinion met with counsel and then, for the first and only time since he has been on the bench, met briefly with each of the two principals separately and without counsel, and finally with the principals and counsel. While possible solutions were discussed, and despite the strong urging of the Judge to settle, without specifying how, it became evident that an amicable solution could not be attained. Therefore, the Court will proceed to dispose of the matter.

## 1. MOTION FOR PRELIMINARY INJUNCTION AND RELATED MOTIONS

Crandall, in 1956, was the National Sales Manager of the Data Processing Supplies Division of International Business Machine Corporation (hereinafter called "IBM"), at which time he aided officers and counsel for that company in the preparation of a proposed Consent Decree in an antitrust suit by the Government. By the terms of said Consent Decree, IBM was to encourage new competitors in the data processing card field. Crandall, seizing the opportunity to enter a theretofore virtually closed field, obtained not only the permission of IBM to leave and engage in this field, but the testimony indicates that he was advised so to do. He left IBM and

teamed up with C. V. Conole, who had had a widely varied and successful business career. C. V. Conole was to furnish the administrative ability, Crandall the "know-how", and they sought outside financing which was obtained from people by the name of Leidesdorf. The Leidesdorfs very shortly became disenchanted with the venture, which resulted in litigation lasting five years. It ended in 1962 in a settlement by which the Leidesdorfs, from a relatively small investment, realized over $1,000,000.00 in settlement. This left Crandall and C. V. Conole in complete ownership of the Company on a 50% basis.

Since Crandall left IBM in 1956, and up to the present, he and C. V. Conole have collaborated on many ventures and have built a really substantial business enterprise. During this period they have purchased or incorporated eleven companies, some of which have been dissolved (Exhibit C-10). The necessity for a discussion of the ramifications of the dealings between the two in the interim period has been eliminated because the defendants herein insist that this proceeding be limited strictly to the granting or refusing of a preliminary, not a final, injunction.

It is interesting to note that from 1956 up to the present, with the exception of the brief period above referred to when the Leidesdorfs were involved, during all of the related transactions, one very significant thing remained constant, viz., Crandall and C. V. Conole always owned equal one-half interests in the corporations with equal voting power.

In 1962, Crandall became a full-time employee of BSC, successor of Whiting Paper Company, a Massachusetts corporation, purchased in 1959. This company was incorporated in 1872 and has had a long and distinguished record in the stationery field. Crandall, with full trust and confidence in the arrangement he had with C. V. Conole, entrusted the full management and operation of the business to C. V. Conole. He permitted C. V. Conole to name all of the Directors, except himself. C. V. Conole named all of the Officers and hired the key personnel, always, of course, with consultation and agreement with Crandall. In other words, C. V. Conole ran the operation, fully acquiesced in by Crandall.

However, it began to appear early in 1963 that C. V. Conole was planning to make this a family empire. He had earlier placed his son, R. C. Conole, in the position of President of the Company, although his son is now only 27 years of age, and for a position of this importance, has very limited business or technical training. His brother-in-law, Charles E. Anable, another defendant, is a Vice-President and Director of the Company. In related companies, a son-in-law and his brother are managing officers, but are not involved in this proceeding. When C. V. Conole tried to make his son Chief Executive Officer in February, 1963, the proposal was voted down by the Board.

The Company, because of its rapid success beyond any reasonable expectations (sales for 1962 and 1963 totaled in excess of $20,000,000.00), has been hampered by lack of cash working capital. In order to operate, the Company received extensive credit from its chief suppliers and obtained a loan of approximately $1,000,000.00 from the Chase Manhattan Bank (hereinafter called "Bank"). As part of the agreement for the loan with the Bank, Crandall and C. V. Conole, as stockholders, voted to amend the Articles of Incorporation to increase the authorized common stock of the Corporation to 1,200,000 shares, to be issued by the Board when, at its discretion, it was deemed advisable (Exhibit C-17-I). Of the authorized shares, Crandall and C. V. Conole each received 300,000 shares. The remaining 600,000 shares were intended to be offered publicly to bring in not less than $2,000,-000.00 to pay off principal creditors and the Bank loan, the balance to remain as working capital. A prospectus was prepared but the issue was never consummated because of a sharp decline in the stock market, as well as BSC becoming

involved in litigation with IBM, and difficulties which arose from an Internal Revenue Service investigation. The prospectus contained no mention of proposed stock options. On August 27, 1963, the provision for the public offering was deleted from the loan agreement, after which Crandall asked C. V. Conole to agree to cancel the remaining outstanding authorized issue in order that the 50% arrangement continue. C. V. Conole refused.

Following this refusal, Crandall held various meetings with defendants, Meyers, Lincoln and Callahan, as well as William E. Speers, Jr. (hereinafter called "Speers"), and Charles J. Molloy, Esq. (hereinafter called "Molloy"), Directors but not defendants. He informed them of his concern about the management and financial condition of the Company and invited their assistance in his forthcoming effort to thwart C. V. Conole's apparent attempt to convert BSC from a jointly held Corporation to a family empire. Crandall was concerned, and properly so, about the Internal Revenue examination. The details thereof are fully set forth in the record and would be important on final hearing, but not at this preliminary stage. It is sufficient to note that if the proposed action by the Internal Revenue Agent is taken, millions of dollars previously charged off as expense, will be placed in income, with a resulting tax liability running into the millions of dollars not only against the Corporation but also against Crandall and C. V. Conole and their respective spouses personally.

Crandall and C. V. Conole were also personal guarantors on a note for $1,-000,000.00 to the Bank, said note being security for the above related loan. Although the Bank and principal creditors knew of the existence of the Internal Revenue claim, they did not know the amount. When Crandall became aware of this, he took it upon himself to inform them of the amount in question and that he was trying to obtain a greater voice in the operation of the Corporation.

These acts were immediately seized upon by C. V. Conole as acts of treachery, which required prompt action purportedly for the benefit of the Corporation. Crandall's entreaties to the five Directors named above were only partially successful in that just two of the five, Speers and Molloy, agreed to aid him. C. V. Conole controlled and dominated the votes of a majority of the Board of Directors (the other defendants herein), either through familial loyalties or by virtue of the fact that these individuals owed their positions to him. C. V. Conole used this domination devastatingly. The record indicates that the defendants, when the opportunity arose, could and did act swiftly to eliminate Crandall and his adherents as officers of the Company, thereby effectively stifling any voice Crandall might have had in the day to day operations of the business.

In a series of meetings in late December, 1963, and January, 1964, Crandall's proposals that he have a greater voice in the activities of the Company were voted down. Speers and Molloy were discharged from their positions in the Company; Crandall was removed as Chairman of the Executive Committee; and a Finance Committee, composed of C. V. Conole, R. C. Conole and Callahan, was set up for the purpose of issuing stock options. Viewed in this context, it is obvious to the Court, and it so finds, that the last mentioned action was the first step in C. V. Conole's ultimate plan to reduce Crandall to the role of a minority stockholder. The Court, at this preliminary stage, expresses no opinion as to the legality of the actions by the Board concerning the removal of Speers, Molloy and Crandall.

During this same period, the Conoles, one or the other, accused Crandall of certain tortious conduct, i. e., that he was acting against the best interests of the Company, as well as certain criminal activity which will not be related here.

One further incident of great significance occurred at this time. In late December of 1963 or early January of 1964 (the exact date is uncertain), C.

V. Conole drew up and his son executed, on behalf of the Corporation, an employment contract between C. V. Conole and the Company (Exhibit D–55). C. V. Conole and R. C. Conole both testified that in preparing this contract, they used the form of contract which the Corporation had with William Whiting (Exhibit D–12) when the Whiting interests were purchased in 1959, i. e., that C. V. Conole's contract was merely a revision of the Whiting contract, the only other existing employment contract with the Company. However, a comparison of the two contracts shows startling differences. Whiting was paid a salary of $12,000.00 for five years. C. V. Conole's contract provided for payments from $50,000.00 to $95,000.00 a year, plus expenses, over a ten-year period, without requiring him to work regularly in the executive offices of the Company, and an acceleration clause making the whole sum ($725,000.00) due and payable in the event that the Corporation should be declared insolvent or bankrupt (voluntarily or involuntarily), or if a receiver were appointed or agreed to, or even if the monthly agreed salary should not be paid as it fell due. It is evident that a pre-arranged default could make this obligation secure to C. V. Conole. This contract smacks of malfeasance on the part of both Conoles, and a flagrant abuse of their respective offices could readily be found on final hearing based on the present record, but at this early stage, the Court will express no opinion on the matter.

The present action stems from the notice of a Board meeting set for February 10, 1964 at Bryn Mawr, Pennsylvania, at 10 A.M. Notice of this meeting was mailed to Crandall on the previous Friday; February 10, being a Monday. It was delivered at his place of residence in Connecticut, after the institution of this litigation, and after a Restraining Order had been entered. The issuance of the notice in this manner was clearly a deliberate attempt to keep Crandall from knowing what was about to occur until after the fact. The attempt failed, however, because Speers and Molloy, who live nearby, received their notices on Saturday, and promptly contacted Crandall in Connecticut, who came to Philadelphia with his personal counsel from New York, and over the weekend prepared the complaint filed in this case.

The purpose of the meeting, as set forth in the notice (Exhibit A of the Complaint), was to read and approve, subject to corrections, the Minutes of a special meeting of the Board held on December 21, 1963, and the Minutes of the regular Board meeting held on January 28, 1964 at Bryn Mawr, Pennsylvania; to approve and ratify all prior acts of the Board of Directors; to amend the By-Laws to provide for the removal of a Director for cause, after notice and hearing by fellow Directors; to authorize the Finance Committee of the Corporation to execute employment contracts with key executives and/or ratify and approve all existing employment contracts; to authorize the Finance Committee of the Corporation to extend restricted stock options to no more than ten key executives, the total value not to exceed $200,000.00, such funds to be used for the ordinary purposes of the business and/or to expand the business of the Corporation.

The Complaint in this action (Docket Paper #1) was filed in this Court on Monday morning, February 10, 1964, along with a Motion for a Temporary Restraining Order (Docket Paper #2), and a Motion for a Temporary Injunction (Docket Paper #3). A Temporary Restraining Order was issued in this Court at approximately 8:52 A.M. of the same day, but due to inclement weather conditions, the United States Marshal, accompanied by Crandall and his counsel, did not reach the scene of the meeting until approximately 10:15 A.M., at which time the agenda had reached only the approval or disapproval of minutes of previously held meetings of the Board of Directors. None of the matters restrained had yet been reached on the agenda. As found by the Court

in the Criminal contempt proceedings (M. #2666), each of the named defendants in this action was properly served and informed of the fact of the Order of the Court by the Marshal. Furthermore, Crandall, during the course of the meeting, read all of the Restraining Order to the Directors. Despite this, C. V. Conole and the other defendants, over the opposing votes of Crandall, Speers and Molloy, passed the very resolutions they were restrained from acting upon. The defendants herein have been found guilty of criminal contempt and have been fined. That phase of the case is now on appeal to the Court of Appeals.

■ At the outset, we are met with the question of jurisdiction and venue. Jurisdiction is based on diversity of citizenship and the amount in controversy under Title 28 U.S.C.A. § 1332. Clearly, this is an action between citizens of different States and the requisite jurisdictional amount is present in that the property right which is being injured is a one-half interest in a Corporation having annual sales in excess of $20,000,000.00; Shering Corporation v. Sun Ray Drug Co., 320 F.2d 72, 75 (3 Cir. 1963). All the defendants were personally served in this District and the acts sought to be enjoined occurred here. Therefore, this Court has jurisdiction over the parties as well as the subject matter of this suit.

■ The Court also finds that venue is properly laid in this District, as provided by Title 28 U.S.C.A. § 1392(a); Sheppard v. Atlantic States Gas Co., 167 F.2d 841 (3 Cir. 1948); DeGeorge v. Mandata Poultry Co., 196 F.Supp. 192 (E.D.Pa.1961). This is so because all of the defendants reside in Pennsylvania. The two Conoles, Callahan, Lincoln and Anable are residents of the Middle District of Pennsylvania. The defendants have alleged that Anable does not reside in the Middle District of Pennsylvania, but his testimony is clear, and the Court finds, that he was and is a resident of Sky Top, Pennsylvania, in the Middle District, for the purposes of venue. The evidence clearly establishes that Meyers is a resident of this District. Actually, the same may be said about C. V. Conole, since at the time the action was instituted, he was residing in an apartment in Bryn Mawr, Pennsylvania, in this District. Regardless of that fact, however, the action could have been brought in either the Eastern or Middle District of Pennsylvania, and, therefore, is properly before the Court.

■ The question then arises— Should this Court decline to exercise the jurisdiction it possesses in that this case relates to the internal affairs of a foreign Corporation? Generally, Pennsylvania courts of equity decline to take jurisdiction over cases such as this, but this rule, being discretionary, is flexible, and depends on the facts of each case and Pennsylvania courts have acted in some instances; Cunliffe v. Consumers Ass'n of America, 280 Pa. 263, 272, 273, 124 A. 501, 32 A.L.R. 1348 (1924); Evans v. R. W. Evans & Co., 284 Pa. 126, 128, 130 A. 313 (1925); Wettengel v. Robinson, 288 Pa. 362, 368–370, 136 A. 673 (1927); Conerty v. Butler County Oil Refining Co., 301 Pa. 417, 420, 152 A. 672 (1930); Plum v. Tampax, Inc., 399 Pa. 553, 160 A.2d 549 (1960); National Baptist Convention United States of America, Inc. v. Taylor, 402 Pa. 501, 166 A.2d 521 (1961).

■ Furthermore, a Federal Court in deciding questions relating to the internal affairs of a corporation "does not trespass on a forbidden domain"; Williams v. Green Bay & W. R. Co., 326 U.S. 549, 553, 66 S.Ct. 284, 90 L.Ed. 311 (1946); Koster v. Lumbermens Mutual Cas. Co., 330 U.S. 518, 527–529, 67 S.Ct. 828, 91 L.Ed. 1067 (1947).

■■ In a case such as this, where it appears that one group in the Corporation is working for its own profit at the expense of another group, Courts do interfere to protect the group being wronged. Kroese v. General Castings Corporation, 3 Cir., 179 F.2d 760, 763, 15 A.L.R.2d 1117, cert. den. 339 U.S. 983, 70 S.Ct. 1026, 94 L.Ed. 1386 (1950); Williamson v. Missouri-Kansas Pipe Line

**712**

Co., 56 F.2d 503, 510 (7 Cir. 1932). To the same effect in a State Court, see Lydia E. Pinkham Medicine Co. v. Gove, 298 Mass. 53, 9 N.E.2d 573, 576 (1937). The Court will so act here.

■ This is also the most convenient forum for a trial of this action in that all of the parties reside here; the books and records of the Corporation are located here; the acts sought to be enjoined have occurred here; all of the executive offices are located here, and at the time the suit was instituted, the Chief Executive Officer, C. V. Conole, had his office in this District, and the national sales program of the Company is directed from its offices in this District. The Company has plants in fourteen States (including one in Pennsylvania), with sales offices in seventeen States. All that it maintains in Massachusetts are its registered office and corporate Clerk, to comply with local requirements, and one plant. In the light of these factors, the Court will not decline jurisdiction on the basis of forum non conveniens. See Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508, 509, 67 S.Ct. 839, 91 L.Ed. 1055 (1946); Koster v. Lumbermens Mutual Cas. Co., supra, 330 U.S. at pages 527, 528, 67 S.Ct. 828; Williams v. Green Bay & W. R. Co., supra, 326 U.S. at page 553, 66 S.Ct. 284.

■ The two principal matters presently to be determined and decided are: (1) Whether Crandall has proved, like any applicant for a preliminary injunction, a right to such relief, and that he will suffer irreparable harm during the pendency of the action if it is not granted, Joseph Bancroft & Sons Co. v. Shelley Knitting Mills, 268 F.2d 569, 574 (3 Cir. 1959), and (2) notwithstanding proof of the above, whether on the balancing of conveniences, the harm to plaintiff, should the relief be denied, decidedly outweighs the harm to the defendants, if the relief be granted; Ohio Oil Co. v. Conway, 279 U.S. 813, 815, 49 S.Ct. 256, 73 L.Ed. 972 (1929); Joseph Bancroft & Sons Co. v. Shelley Knitting Mills, supra, 268 F.2d at page 574; Natco Corporation v. Great Lakes Industries, Inc., 214 F.Supp. 185, 193, 194 (W.D.Pa. 1962).

From the present record, it is apparent that on final hearing, a Court could find that by their actions, the defendants have violated a duty imposed upon them by virtue of their offices, for which violations the plaintiff herein could be afforded the relief he requests. This is especially true as regards C. V. Conole's employment contract and the proposed issuance of stock. See Wilson v. Jennings, 344 Mass. 608, 184 N.E.2d 642, 646, 647 (1962); Anderson v. Albert & J. M. Anderson Mfg. Co., 325 Mass. 343, 90 N.E.2d 541, 543, 544 (1950); Shaw v. Harding, 306 Mass. 441, 28 N.E.2d 469 (1940); L. E. Fosgate Co. v. Boston Market Terminal Co., 275 Mass. 99, 175 N.E. 86, 90 (1931); Albert E. Touchet, Inc. v. Touchet, 264 Mass. 499, 163 N.E. 184, 187 (1928).

■ The Court will not express an opinion as to the ultimate outcome of this action. The Court will state that plaintiff has shown a probable right to permanent relief, but the possibility that the Court might later decide the right to permanent relief adversely to plaintiff, does not preclude it from granting the temporary relief; Bergen Drug Company v. Parke, Davis & Company, 307 F.2d 725, 727 (3 Cir. 1962).

The Court has no hesitancy in finding, and does find, that Crandall would suffer irreparable harm if the defendants were permitted to proceed with the actions which they took at the February 10 meeting and have not yet effectively rescinded. This Court finds that if the By-Laws were amended to provide for the removal of Directors by fellow Directors, Crandall, Speers and Molloy would be removed as surely as night follows day, and replaced with men more favorably disposed to C. V. Conole's ideas. The Court could also find, on final hearing, that the Directors lack the power to amend the By-Laws in this regard. A decision on this point is unnecessary at this time. This proposed amendment was to be the final act on the part of C. V. Conole to

render Crandall virtually powerless as regards the running of the business, while he would still be saddled with his personal liabilities referred to above.

It is further found that the Finance Committee, with the two Conoles constituting a majority of it, would issue stock options to destroy Crandall's 50% interest and shift the balance of voting power on the stockholder level to C. V. Conole. The Court also finds that since the options were to be limited to ten key executives, and each member of the Board being a "key executive", they were the intended optionees, and would exercise their voting rights in accord with C. V. Conole's plans and thereby complete the ouster of Crandall.

To find that these Directors, upon receipt of the options, would change their voting habits, would be to engage in sheer fantasy.

This same result could be achieved more expeditiously through the Conole-controlled Finance Committee issuing one option for one share at par value ($1.00), either to C. V. Conole himself or to one of his associates.

The Court is not impressed with the contention that the options were a means to raise capital because of the fact that the total value of the options was not to exceed $200,000.00, a sum so small as to be of little, if any, help to a Company in need of millions. The Court is likewise unimpressed with the contention that the options were to give the optionees an opportunity to participate in the growth of the Corporation since in its entire history, BSC has never issued a dividend, and in its present financial condition, none appear in the offing. The real purpose of the options was to gain complete control of the Company.

C. V. Conole's grand plan, as found by the Court, is clear, viz., by acting through the Board which he controlled, he proposed to remove Crandall as an Officer, then to remove Crandall as a Director, and finally relegate Crandall to the role of a minority stockholder via the issuance of stock options. He was so intent on having these options issued that he, with the aid of the other defendants, on February 10, 1964, violated the Order of this Court in order to authorize the Finance Committee to issue them.

The Court also finds that should C. V. Conole's contract be effectuated, Crandall would also suffer irreparable harm. There is no doubt that this contract would be effectuated, because by virtue of the actions taken on February 10, 1964, the Finance Committee has the authority to ratify existing employment contracts or to execute new ones, the majority of said Committee being C. V. Conole, the author of his own contract, and R. C. Conole, who has already executed it on behalf of the Corporation.

The record indicates that up to the day on which the Board was called upon to vote the above authority to the Finance Committee, they were unaware of the existence of this contract, with the exception of the two Conoles, and Callahan, who witnessed it. These very persons constituted the entire Committee. Once executed, C. V. Conole, at his pleasure, could cause a default on behalf of the Corporation (a failure to pay one month's salary) and be entitled to the sum of $725,000.00 without performing a day's work.

On balancing the conveniences between the parties, it is evident that should this temporary relief be denied, Crandall will be gravely injured, whereas if granted, the defendants can conduct themselves as before, except that they will not be permitted to tamper with the equality of control as it existed prior to the meeting of February 10, 1964.

Crandall, in his brief at page 15 states: "Plaintiff therefore urges this Court to protect him from the irreparable harm threatened by the six individual defendants and preserve the status quo, leaving to the parties the enforcement in Massachusetts of the rights granted to them under Massachusetts law".

While the Court recognizes that Crandall does have certain remedies under Massachusetts law, it finds, how-

ever, that these remedies are not so adequate as to preclude the granting of the preliminary injunction.

*Adequate remedy at law* " 'means a remedy vested in the complainant, to which he may at all times resort at his own option, fully and freely, without let or hindrance' "; Columbian Cat Fanciers v. Koehne, 68 App.D.C. 257, 96 F.2d 529, 532 (1938).

From the Court's own research of the Massachusetts Corporation Law, it appears that Crandall can have a stockholders' meeting called. However, since a quorum necessitates the presence of at least a majority of voting shares, C. V. Conole could block any action at such meeting by merely staying home. It is also noted that the apparently mandatory provision in the Massachusetts law, requiring the annual stockholders' meeting to be held within 90 days after the end of the Corporation's fiscal year, has been ignored in this case.

Furthermore, even if such meeting would be held, it is obvious to the Court that, as things now stand, a deadlock would result in any election of Directors, in which case Crandall would then be forced to seek dissolution of the Corporation as provided in Mass.G.L. c. 155 § 50. This is the only remedy which will protect Crandall's rights, but under the above definition, it is not adequate unless the preliminary injunction is issued.

First, the remedy is only available to a stockholder or group of stockholders, who own not less than 40% of the issued voting stock in a corporation like BSC. It is apparent that the Conoles, acting as a majority of the Finance Committee, could strip Crandall of this remedy by issuing stock options. The total value of the options is not to exceed $200,000.00, but the shares can be issued at par value ($1.00) and, therefore, 200,000 shares could be issued, thereby reducing Crandall's interest to 37.5%.

Secondly, assuming that this action were not taken and the remedy was available to Crandall, it would still cost him dearly to exercise it. It is at this juncture that the insidious nature of C. V. Conole's employment contract manifests itself and it becomes crystal clear that in drafting his contract, C. V. Conole was acting solely for his own personal gain. Should dissolution be ordered, a receiver would be appointed, at which point, by virtue of the acceleration clause in the contract, C. V. Conole would be entitled to $725,000.00, a very high price to pay in order to have a remedy at law.

For the above reasons, the Court finds that Crandall's remedies under Massachusetts law are grossly inadequate, and further, that this Court should act to aid the plaintiff to allow him freely to exercise these rights.

While this Court is convinced that the rights which Crandall may exercise in the Courts of Massachusetts will bring him no more than dissolution of the Corporation, this Court will interfere only temporarily in the affairs of the Corporation to the extent that it will grant a preliminary injunction restraining the defendants from taking the actions contemplated at the February 10 meeting for a limited period, during which time plaintiff may institute, in the Courts of Massachusetts, such actions as he may deem necessary to protect his interests in BSC in that State.

This time limit is imposed to avoid, as far as possible, injury to either party, and at the same time, protect the interests of all concerned; Inland Steel Co. v. United States, 306 U.S. 153, 156, 157, 59 S.Ct. 415, 83 L.Ed. 557 (1939); Brotherhood of Locomotive Engineers v. Missouri Kansas Texas R. Co., 363 U.S. 528, 531, 532, 80 S.Ct. 1326, 4 L.Ed.2d 1379 (1960).

The recitation of facts contained in this Opinion, because of the preliminary nature of the present proceeding, is not as fully detailed as on final hearing. The Court, therefore, will pass upon plaintiff's and defendants' Requests for Findings of Fact and Conclusions of Law, as follows:

## FINDINGS OF FACT

Plaintiff's request #1 is amended by deleting the words "and Chairman of its

Executive Committee" from the second line thereof, and as amended, is affirmed; plaintiff's request #2 is amended by changing the word "late" to "early", and as amended, is affirmed; plaintiff's request #3 is amended by deleting phrases (a) and (c) thereof, and as amended, is affirmed; plaintiff's request #6 is denied; plaintiff's amended request #6 is amended by deleting the words "apparently construed" in the first line thereof and substituting the words "for his own ulterior purpose chose to construe", and as amended, is affirmed; plaintiff's request #7 is affirmed, with the addition at the end thereof the following: "This action was a willful disregard of the rights of Crandall in that an acceleration clause subjected the Corporation to immediate liability of $725,000.00 to C. V. Conole personally, in the event of a deliberate act by C. V. Conole to accelerate the contract"; plaintiff's request #8 is amended by deleting the words "if not completely" in line 11 thereof, and as amended, is affirmed; plaintiff's request #9 is amended by deleting all of the request following the word "merit" in the third line thereof, and as amended, is affirmed; plaintiff's requests numbered 4, 5, 11, 13, and original request #10 are affirmed; plaintiff's requests numbered 12, 14, 15 and 16 are refused as stated.

Defendants' requests numbered 1 through 6, 8, 10, 11 and 12 are affirmed; defendants' request #7 is amended by deleting the word "substantial" where it appears, and as amended, is affirmed; defendants' request #9 is amended by deleting in the third line thereof the words "for a term of one year" and substituting in lieu thereof "until the next stockholders' meeting legally constituted"; it is further amended to state that Charles E. Anable is a resident of Sky Top, Pennsylvania, and not of New Jersey, and as amended, is affirmed; defendants' requests numbered 13 through 43 are refused as stated.

To the extent that there is any inconsistency between the above rulings and the facts found in the Opinion, the latter shall govern.

In the light of all the above, (1) defendants' Motion for Preliminary Disposition of Motion for Dissolution of Temporary Restraining Order and to Dismiss Complaint (Docket Paper #7); (2) defendants' Motion for Dissolution of Temporary Restraining Order and to Dismiss Complaint (Docket Paper #8), and (3) defendants' Amended Motion for Dissolution of Temporary Restraining Order and to Dismiss Complaint (Docket Paper #13), will be denied.

## 2. MOTION TO HOLD DEFENDANTS IN CIVIL CONTEMPT

██ The Court now finds the defendants guilty of civil contempt by virtue of the actions taken by them at the Board of Directors' meeting on February 10, 1964, in direct violation of the Temporary Restraining Order which was duly issued and served upon them, and of which they were completely aware.

The Court further finds that the defendants have not purged themselves of this contempt in that they have not rescinded the actions taken at the aforementioned meeting. The resolution passed at the February 26 meeting, confirming a statement by the Chairman, was merely an attempt to change the meaning, wording, and intent of the actions taken on February 10, to enable them to defend against a charge of criminal contempt, and in no way effected a recision of the prior acts.

██ However, the Court will suspend any imposition of fines because, on advice of present counsel, no action has yet been taken to implement the acts done in violation of the Restraining Order of February 10, 1964.

██ The Court will award reasonable costs and counsel fees to plaintiff which were necessarily incurred in the investigation and prosecution of the contempt proceedings, such costs and fees to be assessed against the defendants jointly. Counsel for plaintiff shall sub-

mit a petition listing his fees and costs, to aid the Court in its determination of what is a reasonable fee under the circumstances. A hearing will be held thereon, at which time the defendants will have full opportunity to present any objections which they might have, in any way they see fit.

The defendants will also be ordered to convene a special meeting of the Board of Directors at a time to be fixed by the Court, at which they will rescind, in proper legal form, all actions taken by them at the meeting of February 10, 1964.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties.

2. The Court has jurisdiction of the subject matter, and in the exercise of its discretion, will exercise and retain that jurisdiction, at least until C. V. Conole or L. Stanley Crandall have a reasonable opportunity to take advantage of remedies available to them under Massachusetts law.

3. Plaintiff has established by a fair preponderance of the evidence that he will suffer irreparable harm if the actions restrained in paragraphs (a), (b), (c) and (d) of the Temporary Restraining Order dated February 10, 1964 (Docket Paper #2), are not further enjoined.

4. The harm to plaintiff, should the relief be denied, decidedly outweighs the inconvenience to the defendants, if the relief be granted.

5. Plaintiff has no adequate remedy at law.

6. Plaintiff has not established his right to the relief requested in his Amended Motion for Preliminary Injunction (Docket Paper #16), and such requests are, therefore, denied.

7. Plaintiff is entitled to, and will be granted, a preliminary injunction to effectuate these Conclusions of Law.

8. Defendants' Motions for Preliminary Disposition of Motion for Dissolution of Temporary Restraining Order and to Dismiss Complaint (Docket Paper #7); for Dissolution of Temporary Restraining Order and to Dismiss Complaint (Docket Paper #8), and defendants' Amended Motion for Dissolution of Temporary Restraining Order and to Dismiss Complaint (Docket Paper #13), are denied.

9. Defendants are guilty of civil contempt and have not purged themselves of that contempt.

10. Since the actions taken in violation of the Temporary Restraining Order have not been implemented, no fines will be imposed, but the defendants will be jointly assessed a reasonable attorney's fee and costs, payable to plaintiff's counsel.

11. Defendants will be ordered to call a Board of Directors' meeting at which they shall rescind, in proper legal form, the actions taken at the February 10, 1964 meeting, which were violative of the Court's Temporary Restraining Order.

In light of the Court's Conclusions of Law, the ones submitted by the plaintiff and defendants, insofar as they are inconsistent with the above, are denied, and as far as consistent therewith, are affirmed.